**DICHMAN, WRIGHT & PUGH, Inc.,**
Libelant,

v.

**UNITED STATES of America,**
Respondent.

United States District Court
S. D. New York.
Sept. 29, 1956.

Hill, Betts & Nash, New York City, Kominers & Fort, Washington, D. C., for libelant. J. Franklin Fort, Washington, D. C., Edwin Longcope, New York City, John Cunningham, Israel Convisser, Washington, D. C., of counsel.

Paul W. Williams, U. S. Atty., New York City, for respondent. Leavenworth Colby, Chief, Admiralty & Shipping Section, Dept. of Justice, Benjamin H. Berman, Attorney in Charge, New York Office Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., of counsel.

DIMOCK, District Judge.

This is a suit in admiralty to recover amounts of charter hire which libelant claims to have overpaid. Three "causes of action" are set forth in the libel but the first and third have been held to be time barred. Respondent United States, the shipowner, excepts to the second on the ground of insufficiency.

Libelant seeks to recover amounts paid, under a sliding scale of "additional charter hire" set forth in the charter party, insofar as they exceed 50% of so much of its profits as exceed 10% on the capital employed in the operation of the ships. It cites in support of its claim section 709(a) of the Merchant Marine Act of 1936, as amended, 49 Stat. 1985, 46 U.S. C. § 1101 et seq., which is copied in the margin[1]. The sliding scale in the charter party, in clause 13, copied in the margin[2], begins by providing for payment to

---

1. Sec. 709 (a) "Every charter made by the Commission pursuant to the provisions of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum: *Provided,* That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years."

2. "Clause 13. *Additional Charter Hire.* If at the end of the calendar year 1950, or any subsequent calendar year or at the termination of this Agreement, the cumulative net voyage profit (after the payment of the basic charter hire hereinabove specified and payment of the Charterer's fair and reasonable overhead expenses applicable to operation of the Vessels) shall exceed 10 per centum per annum on the Charterer's capital necessarily employed in the business of the Vessels (all as hereinafter defined), the Charterer shall pay over to the Owner at Washington, D. C., within 30 days after the end of such year or other period, as additional charter hire for such year or other period, an amount equal to the percentage of such cumulative net voyage profit in excess of 10 per centum per annum on such capital computed in accordance with the following table (but such cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in any subsequent year or period):

Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) not in excess of $100 per day —50%.

Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) in excess of $100 per day but not in excess of $300 per day—75% on such excess over $100 per day.

Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) in excess of $300 per day—90% on such excess over $300 per day.

respondent of 50% of the profits over 10%, just as does section 709(a), but the charter party maintains that rate only so long as the profits do not exceed $100 per day. Insofar as they do exceed $100 per day, and do not exceed $300 per day, the charter party, unlike section 709(a), goes on to provide for payment of 75% and, insofar as they exceed $300 per day, 90%.

Libelant contends that the 50% rate fixed by section 709(a) is a limitation. Respondent contends that it is a mere minimum. For the reasons hereinafter stated, I hold that it is a limitation and that libelant is entitled to the return of the excess paid on the face of the libel.

Section 709(a), by its terms, contemplates two types of payment to the shipowner: "the charter hire reserved in the charter" and "additional charter hire". The "additional charter hire" is 50% of so much of the profits "(after payment of the charter hire reserved in the charter * * *)" as exceeds 10% on the capital employed. Thus the "charter hire reserved in the charter" is a factor in the computation of the "additional charter hire".

The obvious purpose of the statutory requirement that charters shall contain a provision for the payment of this "additional charter hire" is to cut down the excessive profits payable in case the "charter hire reserved in the charter" has been fixed too low.

At the time of the adoption of section 709(a), it was clear that the share of the excess profits destined for the owner was 50% and that the Commission was powerless to raise or lower that share. By section 706(a) of the Act it was provided that the Commission should not "charter its vessels to private operators except upon competitive sealed bids" and section 707(a) contained the direction that the "Commission shall award the charter to the bidder proposing to pay the highest monthly charter hire". When the critical section 709(a) referred to "the charter hire reserved in the charter" it must have meant this "monthly charter hire" which constituted the basis of the bids. Thus the requirement in that section that the charter should contain a provision for "additional charter hire" of 50% of the excess profits was for the purpose of giving the owner a share of the windfall if the bid should prove to have been too low. In order to bid intelligently the bidders had to know in advance what percentage of the total excess profits this share would be. The statute said 50%. Certainly the Commission by its fiat could not say "Bids will be on the assumption that the rate of recapture will be 75%" and even less could it, after a bid had been accepted, say "Your bid was on the assumption that the rate of recapture would be 50% but the charter party is going to provide that it will be 75%".

Since, therefore, section 709(a) at the time when it was adopted did not admit of any recapture rate in excess of 50%, the owner's position must be that its meaning was changed for the purposes of its application to the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S. C.App. § 1735 et seq.

Section 5(c) of that act made applicable to charters thereunder the critical section 709(a) of the Merchant Marine Act of 1936, copied in note 1 supra. The new act, in section 5(b) copied in the margin,[3] abandoned competitive bidding:

The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire at such times and in such manner and amounts as may be required by the Owner; provided however, that such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner, at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required.

3. Sec. 5(b) "The charter hire for any vessel chartered under the provisions of this

as a basis for fixing charter hire and provided that the charter hire must be fixed "at such rate as the Commission determines to be consistent with the policies of this Act". This section places two bottom limits on the Commission's scope, however. The rate shall not be less than 15% of the statutory sales price except upon the affirmative vote of at least four members of the Commission and, even then, shall not be less than the prevailing world market charter rates, except in the case of large passenger ships.

Congress was not satisfied with the restrictions that the charter hire must be at a rate determined to be "consistent with the policies of this Act" and must not be less than 15% of the sales price in the absence of the affirmative vote of four commissioners and even then must not be less than the world market rate. It made applicable the old provision in section 709(a) of the Merchant Marine Act of 1936 so that, in the event of a windfall due to too generous a determination or a change in traffic conditions, the charterer must share the excessive profits with the owner. According to the words of the statute the charterer and the owner are to share these excess profits fifty-fifty. In spite of the express direction: "[e]very charter * * * shall provide that * * * the charterer shall pay over * * * one-half" of such profit, and contrary to the clear intent of the statute when originally enacted, the respondent says that the charter need only provide that the charterer shall pay over an expressed fraction of such excess profit at least as large as one-half.

To substantiate such an expansion of the literal meaning of the statute and of its original intent, the owner invokes the power given to the Commission by section 5(b) to fix the charter hire rate. That power, however, was exhausted when the amount of the charter hire was fixed. That amount was fixed in dollars "at such rate as the Commission determines to be consistent with the policies of this Act". To say that the power to fix the charter hire carries over to the fixing of the rate of division of the excess profits under 709(a) would be to render the statutory scheme for two items of charter hire meaningless. The effect of the rule contended for by the owner is that the Commission could fix the rate of the owner's share of the excess profits at any figure not less than 50% so long as the net result would be that the sum of the "charter hire reserved in the charter" and the "additional charter hire" would produce "such rate as the Commission determines to be consistent with the policies of this Act". If the entire amount payable under the charter party were indeed to be nothing but charter hire "at such rate as the Commission determines to be consistent with the policies of this Act," no intelligible purpose could be assigned to a statutory requirement that this amount, be expressed in the charter party as the sum of an arbitrarily fixed "charter hire reserved in the charter" and an "additional charter hire" developed from the "charter hire reserved in the charter" among other factors.

The owner's contention is that the power to increase the owner's share of the excess profits above 50% in fixing the "additional charter hire" is necessary in order to make sure that the sum of the "charter hire reserved in the charter" and the "additional charter

---

section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act, but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter). Except in the case of vessels having passenger accommodations for not less than eighty passengers, rates of charter hire fixed by the Commission on any war-built vessel which differ from the rate specified in this subsection shall not be less than the prevailing world market charter rates for similar vessels for similar use as determined by the Commission."

hire" shall equal "such rate as the Commission determines to be consistent with the policies of this Act". Since, under a correct interpretation of section 709 (a), the "additional charter hire" forms no part of the rate determined by the Commission to be consistent with the policies of the Act, this argument for the power to fix the owner's share at more than 50% falls. Section 709(a) is clear in fixing it at 50% so I conclude that that share is a maximum as well as a minimum.

I see no reason why the Commission should not fix charter hire "at such rate as the Commission determines to be consistent with the policies of this Act" by inserting in the charter party a flat rate clause and a clause providing for payment on a sliding scale based on more than 50% of the excess profits. In doing so it would be fixing the "charter hire reserved in the charter" and it would be required by section 709(a) to insert in the charter another profit sharing clause in the statutory form to provide that any excess profits produced by the flat rate clause and the sliding scale clause would be "additional charter hire" and divided fifty-fifty. There is no allegation that that was done here, however.

It is asserted that Congress knew of the practice of computing charter hire on a sliding scale of profits. Be that as it may, it is not asserted that Congress knew that a sliding scale clause was being used as a substitute for the 50% division clause required by section 709(a).

It is said that a charterer cannot be heard to complain that the owner has omitted a clause which would have required the charterer to pay additional charter hire. That might be true if it appeared that the Commission had formally determined that the sum of the two rates fixed by the flat rate clause and the sliding scale clause in the charter was the rate consistent with the policies of the Act and had inadvertently omitted the profit sharing clause required by section 709(a). Again, however,

there is no allegation that that was done here. On the face of the libel I must assume that the owner intended to comply with the law and that the sliding scale profit sharing clause was inserted in attempted compliance with section 709(a). Indeed the owner says in its brief "The Commission's draftsmen in Clause 13 of the charter merely merged the mandatory 50 percent minimum of profit sharing into a discretionary sliding scale of profits, which the Commission had fixed under Section 5(b)".

The argument that libelant, having signed a charter party fixing the owner's share at more than the lawful 50%, cannot recover the excess has been answered in this Circuit in Sword Line, Inc., v. United States, 228 F.2d 344, at page 346, affirmed 351 U.S. 976, 76 S.Ct. 1047. There Judge Learned Hand said:

"The claim has for its premise that § 709 of the Merchant Marine Act of 1936 made illegal that portion of 'clause 13' of the charter that stipulated for the graduated scale of profit-sharing instead of for a division half and half, regardless of amount. It might be argued, if the libellant is right about § 709, that no contract was ever made, because the section made the libellant's promise unenforceable and there were therefore no mutual promises. On the other hand, if the statute did indeed limit the Commission to an even division of profits, it was the Commission's duty so to limit the libellant's promise; and we should not assume that the Commission would not have chartered the ships, unless it was to receive the unlawful hire. Obviously, we may impute to the libellant willingness to pay the lesser hire; so that it is proper to proceed as though there had been a contract for an even division, and nevertheless the Commission had compelled the libellant to pay more than the disputed hire."

The exception to the second "cause of action" is overruled.