**UNITED STATES of America,**
**Plaintiff**

v.

**EAST HARBOR TRADING CORPORA-**
**TION, also known as East Harbor**
**Steamship Corporation and Seaboard**
**Surety Company, Defendants.**

United States District Court
S. D. New York.

Dec. 29, 1960.

**246**

S. Hazard Gillespie, Jr., U. S. Atty., for plaintiff; Benjamin H. Berman, New York City, Atty. in Charge, Leavenworth Colby, Lawrence F. Ledebur, Washington, D. C., Attys., Admiralty & Shipping Section Dept. of Justice, of counsel.

Zock, Petrie, Sheneman & Reid, New York City, Kominers & Fort, Washington, D. C., for defendants; J. Franklin Fort, Washington, D. C., Francis J. O'Brien, New York City, John Cunningham, Israel Convisser, Washington, D. C., of counsel.

IRVING R. KAUFMAN, District Judge.

The government brought this action to recover monies allegedly due under a charter agreement between the Maritime Commission and the defendant East Harbor Trading Corporation,[1] and under the statutes applicable to this agreement. Defendant has moved to dismiss the complaint for failure to state a claim upon which relief may be granted,[2] and for want of jurisdiction, while the plaintiff has moved for summary judgment.

The charter in question was entered into on or about February 26, 1951. It contained two provisions governing the rate of charter hire to be paid by East Harbor to the Maritime Commission. The first provided for so-called "Basic Charter Hire", which was set at 15% per annum of the sales price of the vessel chartered. The second provided for what was referred to in the charter as "Additional Charter Hire." This clause was geared to the profits which the defendant realized from the operation of the chartered vessel, and provided:

"If at the end of the calendar year * * * the cumulative net voyage profit (after the payment of the basic charter hire hereinabove specified and payment of the Charterer's fair and reasonable overhead expenses applicable to operation of the Vessels) shall exceed 10 per centum per annum on the Charterer's capital necessarily employed in the business of the Vessels * * * the Charterer shall pay over to the Owner * * * as additional charter hire * * * an amount equal to the percentage of such cumulative net voyage profit in excess of 10 per centum per annum on such capital computed in accordance with the following table * * *:

Cumulative net voyage profit * * * not in excess of $100 per day—50%

Cumulative net voyage profit * * * in excess of $100 per day but not in excess of $300 per day—75% on such excess over $100 per day.

Cumulative net voyage profit * * * in excess of $300 per day —90% on such excess over $300 per day."

---

1. Seaboard Surety Company was joined as a defendant since it executed a bond guaranteeing performance by East Harbor of its obligations under the charter. Hereinafter, any reference to the defendant will be to East Harbor, since it is the party primarily involved in the litigation.

2. Since affidavits and exhibits have been submitted in connection with these motions, defendant's motion to dismiss the complaint for failure to state a claim upon which relief may be granted, will be treated, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., as a motion for summary judgment.

Defendant regularly paid the amounts of "basic" charter hire due under the charter, but after initially paying the full amounts specified in the sliding-scale "Additional Charter Hire" clause, it then refused to pay any sum under this provision in excess of 50% of its profits. In this regard, it contends that insofar as the sliding-scale provision requires payments of greater than 50% of its profits, it is contrary to the express mandate of Congress as contained in section 709(a) of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1199(a) and is hence nugatory.

The plaintiff basically presents two claims. It argues that section 5(b) of the Ship Sales Act of 1946, 50 U.S.C.A. Appendix, § 1738(b), *required* the Maritime Commission to charge, as basic charter hire, a rate equal to the prevailing world market charter rates for similar vessels chartered for similar use. Admittedly, the Maritime Commission did not charge such a rate, which, it is conceded, would be greater than the sum of the 15% basic charter hire actually charged, and the portion of the sliding-scale clause providing for payment of greater than 50% of profits. Nevertheless, the government, since it contends that the statute required the Maritime Commission to charge the world market rate, argues that the charter must be treated as if this rate had, in fact, been charged. Thus, it seeks to recover the difference between the amount which East Harbor actually paid, and this world market rate.

Alternatively, the government seeks to recover the amounts in excess of 50% of profits, allegedly due under the sliding-scale provision of the charter contract, which the defendant has refused to pay. The government's two contentions will be considered seriatim.

■ At the outset, it is necessary to deal with the defendant's claim that the court lacks jurisdiction over this action. Defendant argues that the court has no jurisdiction to review the propriety of the rate of charter hire fixed by the Maritime Commission in the exercise of the discretion given to it by statute. But this contention, while it may have some appeal as an abstract proposition, ignores the essential nature of the government's claim. The government does not contend that the Maritime Commission should have exercised its discretion so as to charge a rate equal to the world market rate; its argument, rather, is that section 5(b) *required* Maritime to charge this rate in this situation. Similarly, the government's alternative contention calls for a construction of the statutory scheme. It is clear that the claims presented in the instant action do not require a review of the exercise of administrative discretion. Therefore, the defendant's motion to dismiss for lack of jurisdiction must be denied.

■ Proceeding now to the merits, it is helpful first to examine briefly the scheme set up by Congress to regulate the rates to be charged in charters negotiated by the Maritime Commission. Congress clearly contemplated two types of charter hire. Pursuant to section 5(b) of the Ship Sales Act of 1946, Maritime was to charge a basic rate, based presumably on a percentage of the statutory sales price of the vessel involved. This rate was to be "consistent with the policies of this Act." In addition, to protect against an unexpected windfall to the charterer, section 709(a) of the Merchant Marine Act of 1936 required that each contract contain a provision for the payment to the Commission of 50% of the charterer's profit over 10% on the capital employed in the operation of the ship.

The government's first contention involves an interpretation of the language and purpose of section 5(b). This section provided, at the time relevant to this action:

"The charter hire for any vessel chartered under the provisions of this section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act, but, except upon the affirmative vote of not less than four members of the Com-

mission, such rate shall not be less than 15 per centum per annum of the statutory sales price * * * rates of charter hire fixed by the Commission on any war-built vessel *which differ from the rate specified in this subsection* shall not be less than the prevailing world market charter rate for similar vessels for similar use as determined by the Commission." (Emphasis supplied.)

The government somehow gleans from this language a requirement that Maritime never charged a fixed rate below the world market rate. I am unable to follow this reasoning.

The world-market rate limitation becomes applicable, according to the terms of the statute, only if the Commission charges rates "which differ from the rate specified in this subsection." The government contends that this latter clause refers back to the language "consistent with the policies of this Act." Thus, it reasons that, when the Commission does not charge a rate "consistent with the policies of this Act," it is therefore fixing a rate different from that specified in the subsection, and is thus obliged to charge not less than the world market rate.[3] It then argues that 15% of the sale price, as was charged here, is patently inconsistent with the policy of the statute to encourage sales of ships at the expense of chartering. It thus concludes that the world market rate minimum became applicable, and therefore should have been charged.

But this misconstrues the clear import of the statutory provision. While Congress may have been intending to foster sales, it gave the Maritime Commission full discretion to effectuate its policies by allowing it to charge any rate "consistent with the policies of this Act." No maximum ceiling was established to limit this discretion. Thus,

if the Commission decided to set a rate which would approximate the world market rate, it had ample authority to do so. However, 15% of the statutory sales price was considered to be presumptively consistent with the Act's policies, although the Commission was free to charge a higher fixed rate if it felt that the applicable statutory policies so required. But, in order to assure a sufficient return to the government, a rate below 15% was to be charged only upon the affirmative vote of at least four members of the Commission. And, even in this case, the rate was not to be below the prevailing world market charter rate. It is clear from an examination of the statutory language and the pertinent legislative history that the world market rate, as a statutory limitation, is called into play only when the basic rate fixed by the Commission is less than 15%; in that situation, the world market rate acts as an absolute floor to the Commission's discretion. See Dichman, Wright & Pugh, Inc. v. United States, D.C. S.D.N.Y.1956, 144 F.Supp. 922. See also Senate Report 807, 79th Cong., 1st Sess. (1945). Since the Commission did not charge below 15% in the instant case, there was no necessity for the world market rate to be considered. Thus, the government's claim to recover the difference between the amount paid by the defendant and the world market rate cannot stand.

■ The government's second claim, as mentioned above, is to recover the amounts due under the charter contract representing sums in excess of 50% of the defendant's profits. Here, however, it is confronted with section 709(a), which provided at the time relevant to this action:

"Every charter made by the Commission * * * *shall provide* that whenever, at the end of any calendar year * * * the cumulative

---

3. This step in the government's chain of reasoning involves the highly unlikely premise that the Commission would intentionally choose to charge a rate not consistent with the policies of the act, and further that Congress would see fit to provide for such an eventuality.

net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum of the charterer's capital necessarily employed in the business of such chartered vessels, the charterer *shall pay over* to the Commission, as additional charter hire, *one-half of such cumulative net voyage profit* in excess of 10 per centum per annum * * *." (Emphasis supplied.)

█ It is apparent that this section not only authorized, but required the parties to insert a provision in the charter for payment by the charterer of 50% of his profits to the government. And, as Judge Dimock held in Dichman, Wright & Pugh, Inc. v. United States, supra, this 50% share is a maximum as well as a minimum, at least insofar as section 709 is concerned. Cf. Sword Line, Inc. v. United States, 2 Cir., 1955, 228 F.2d 344. Therefore, there is clearly no authority conferred by section 709 for the inclusion of that portion of the charter clause requiring payments in excess of 50% of profits.

█ But the government seeks to avoid this, claiming that the sliding scale for payment of profits in excess of 50% was inserted by the Maritime Commission pursuant to its authority under section 5(b) to fix a rate "consistent with the policies of this Act." As Judge Dimock pointed out in the Dichman, Wright case, there is nothing inherent in the terms of section 5(b) to prohibit the Commission from utilizing a sliding scale in setting a rate designed to effectuate Congressional policies. Indeed, if the Maritime Commission is to effectively carry out its assigned function of implementing the act's policies, it would seem necessary for it to have this flexi-

bility, so as to be able to gear its rates to the vagaries of a changing market situation. In fact, Congress apparently recognized this need for adaptability, for it empowered the Commission to contract "in the same manner that a private corporation may contract." 46 U.S.C.A. § 1117.

Therefore, if the parties actually intended the provision requiring payment in excess of 50% of the defendant's profits to have its statutory basis in section 5(b) rather than in section 709, the government should be entitled to recover. In this view, the portion of the "Additional Charter Hire" clause in the charter which provided for the payment of 50% profits was inserted pursuant to the requirements of section 709, while the additional amounts, including the 15% of the sales price and the excess of 50% of profits, were intended as a combined formula to reach a rate "consistent with the policies of this Act," pursuant to section 5(b). If, however, the parties mistakenly believed that authorization for the sliding scale could be found within section 709, and inserted this clause pursuant to that section, the defendant must prevail.

An examination of the affidavits submitted by Charlie McDaniel for the plaintiff and Philip J. Carroll for the defendant reveal a factual conflict on this question which is not properly determinable on a motion for summary judgment. See, e. g., Colby v. Klune, 2 Cir., 1949, 178 F.2d 872 and the many cases decided subsequent to Colby by the Court of Appeals expressing agreement with its principles.

Thus, the plaintiff's motion for summary judgment is denied. The defendant's motion for summary judgment is granted with respect to the government's claim for the difference between the sums actually paid by the defendant and the world market rate, and in all other respects is denied. Settle order.