MASSACHUSETTS TRUSTEES OF
EASTERN GAS AND FUEL
ASSOCIATES, Libelants

v.

UNITED STATES of America,
Respondent.

No. 55–26–W.

United States District Court
D. Massachusetts.

Jan. 15, 1962.

J. Franklin Fort, Washington, D. C., William M. Brady, James S. Eastham, Boston, Mass., Kominers & Fort, Washington, D. C., for plaintiff.

Lawrence F. Ledebur, Dept. of Justice, Washington, D. C., W. Arthur Garrity, Jr., U. S. Atty., Daniel B. Bickford, Asst. U. S. Atty., Boston, Mass., for defendant.

WYZANSKI, District Judge.

## A. INTRODUCTION

This controversy involves the validity and interpretation of Part I Clause E and Part II Clauses 2 and 13 of the standard bareboat charter contract of the Maritime Commission under § 709(a) of The Merchant Marine Act, 1936, 49 Stat. 1985, 46 U.S.C.A. § 1199(a), and § 5(b) and (c) of The Merchant Ship Sales Act, 1946, 60 Stat. 41, 50 U.S.C.A. Appendix, § 1738(b, c). Essentially the dispute turns on whether the Commission acted *intra vires* in providing in the charter for the recapture of a charterer's profits by the Government on the basis of a contractual additional excess profits rate, not covered by § 709(a) of The Merchant Marine Act of 1936.

## B. PLEADINGS IN THIS SUIT

Trustees of Eastern Gas and Fuel Associates (hereafter called "Eastern") filed, under the Suits in Admiralty Act, 41 Stat. 525, 46 U.S.C.A. § 741 et seq., a libel against the United States. The prayer sought recovery of approximately $280,000 alleged due because of Eastern's excess payments of charter hire for 10 United States Government vessels.

The first cause of action pleaded in the libel makes allegations substantially as follows. The Merchant Ship Sales Act of 1946, 60 Stat. 41 authorized the Government to charter, on a bareboat basis, certain war-built vessels. The Maritime Commission, on April 13, 1946, entered, and, on April 23, 1946, published General Order 60, reciting the terms on which it would charter such vessels. Conforming to the Order, the Commission prepared bareboat charter contract MC c–41881. November 7, 1946, libelants, and, November 13, 1946, the Government executed that contract. Upon the basis of the libelants' preliminary accounting statements, based upon the Government's computation of charter hire, the libelants made payments on account. By Audit Report, dated August 20, 1954 the Government made its final review of libelants' accounting. This process required libelants to make payments which libelants allege were excessive and unlawful because contrary to § 709 of the Merchant Marine Act, 1936, 49 Stat. 1985 incorporated in § 5(c) of the Merchant Ship Sales Act of 1946, 60 Stat. 41. Libelants vainly demanded from the Government reimbursement of these allegedly excessive and unlawful payments amounting to approximately $78,000.

The second cause of action repeats the allegations as to the Commission's authority to contract, as to the execution of the contract, and as to the preliminary accountings. Then the libelants allege that on August 15, 1947 the Commission served on libelants a notice effective September 1, 1947, purporting to terminate the charters unless the libelants agreed to an amendment providing that additional charter hire for voyages commenced after September 1, 1947 be computed separately from voyages commenced prior thereto. The libelants allege that this additional charter hire was contrary to the law and the original contract. But "the libelants, under duress and threat of the illegal termination of the charter and without consideration, executed the addendum * * *" The libelants, pursuant to this allegedly improper addendum, paid

the Government $148,554.90, for which they have vainly demanded reimbursement.

The third cause of action repeats much of what is alleged in the second cause of action. But the libelants further, and as an alternative to the second cause of action, plead that even if the aforesaid addendum were valid, and even if the libelants do not succeed on their second cause of action, nonetheless the Government has wrongfully included in the accounting under the addendum the expenses incurred after September 1, 1947 in connection with the S.S. EMILY DICKINSON and the S.S. JAMES BOWDOIN, both of which are asserted not to have engaged in voyages on or after September 1, 1947. The libelants paid on this account $58,563.91, for which they have vainly demanded reimbursement.

In its answer the Government admits that the Commission made the bareboat charter contract set forth in the libel, and that the Government has refused to pay back the charter hire paid by the libelants. But the Government pleads that not merely the bareboat charter contract of November 1946, but also the addendum, sometimes called Shipsales Demise Contract No. MC c–41881, Addendum No. 7, executed in October 1947, were valid under relevant statutes. Furthermore, the Government sets forth as separate defenses that the libelants, knowing the terms of the statute and proposed charters, first, voluntarily executed the contracts and made the payments thereunder, second, did not promptly seek equitable or other relief, and third, did not seek relief within the period of the statute of limitations.

Later, the Government filed a cross-libel.

In its first cause of action, it claimed that for the vessels chartered under the bareboat charter contract No. MC c–41881 Eastern owes $1,125,808.06, which is the difference between the total charter hire actually paid by Eastern, and "the world market hire rate of $2,298,607 (said to be) required to be paid * * *

pursuant to section 5 of the Merchant Ship Sales Act of 1946."

In its second cause of action, the Government claimed that under the aforesaid contract Eastern agreed, particularly in Clause 13, Part II, to a schedule which calls for payments of $528,306.68, of which only $464,876.09 has been paid, leaving still due $63,430.59.

In its third cause of action, the Government claimed that despite § 709(a) of the Merchant Marine Act of 1936, which is incorporated under the aforesaid contract, Eastern in accounting erroneously carried forward from the 1946 annual accounting period into the 1947 annual accounting period "losses plus 10% per annum on the charterer's capital necessarily employed in the business of the vessels in the sum of $5,033.47 * * * thereby decreasing the cumulative net voyage profits in the 1947 accounting period and consequently decreased the amount of charter hire due * * * by ninety per cent of $5,033.47, or [so it is pleaded] $4,530.10."

In its fourth cause of action, the Government for the first time in this litigation referred to Addendum No. 5 to Contract No. MC c–41881, executed by Eastern May 28, 1947 and by the Government July 17, 1947. The Government claimed that under that addendum, for accounting purposes, all vessels under the charter were to be considered as a separate fleet and accounting was to be done on an annual basis. Despite this, Eastern carried forward from the 1946 annual accounting period to the 1947 annual accounting period losses plus 10% per annum on the charter's capital, "thereby decreasing the cumulative net voyage profits in the 1947 accounting period and consequently decreased the amount of charter hire due, * * * in the 1947 annual accounting period by fifty per cent of $6,186.78 or [so it is pleaded] $3,063.09."

Eastern replied with "Exceptions to Cross-Libel." This alleged first, that the cross-libel failed to state a claim upon which relief may be granted; and second, that the first, [not the second], third, and fourth causes of action fail to state a claim within the jurisdiction of this Court.

Then Eastern filed "Exceptive Allegations to the Cross-Libel." This alleged that the Government's first cause of cross-libel had no merit in view of the provisions of the charter contract No. MC c–41881, and that the third and fourth causes had no merit in view of § 709(a) of the Merchant Marine Act of 1936, 49 Stat. 1985, 46 U.S.C.A. § 1199(a) and the Maritime Commission's regulations appearing in 46 CFR 299.49.

## C. FINDINGS BASED ON HEARING OF JANUARY 3, 1962

1. Following the pleadings recited above, the parties filed elaborate briefs and affidavits, running to hundreds of pages. On January 3, 1962 this Court held a hearing at which from these affidavits and like documents the parties selected more than a score of exhibits which they agreed should be received, and which this Court did receive, as evidence. The parties pressed for rulings on the exceptions, the exceptive allegations, and all other matters ripe for rulings of law. From the discussion at the bar it appeared that if this Court ruled now upon the interpretation and validity of the contract on which both the libel and the cross-libel are based, certainly further trial, if any were needed, in this Court would be expedited, and possibly immediate appeal to the Court of Appeals on certain aspects of the case might be proper. On this basis, this Court will address itself to both the facts and the law relevant to the pivotal contract.

2. As of October 1, 1946 Eastern and the Commission entered into a bareboat charter, Contract No. MC c–41881, for the use of certain Government-owned vessels.

3. This contract was in the Commission's then standard form, heretofore considered in Sword Line v. U. S., 2nd Cir., 228 F.2d 344, (per L. Hand, C. J.); Dichman, Wright, & Pugh, Inc. v. U. S.,

S.D.N.Y., 144 F.Supp. 922, (per Dimock, D. J.); United States v. East Harbor Trading Corp., S.D.N.Y., 190 F.Supp. 245, (per I. Kaufman, D. J.); American Export Lines Inc. v. U. S., Ct.Cl., 290 F.2d 925, (per Whitaker, J., Madden, J. dissenting); United States v. Moore-McCormack Lines, Inc., D.Md., 1961, 199 F. Supp. 522 (per Thomsen, D. J.); and other cases not now necessary to cite.

4. In this standard form contract the portions now relevant are Part I Clause E and Part II Clauses 2 and 13, which read as follows:

## "Part I

"CLAUSE E. *Rate of Basic Charter Hire.* Unless otherwise specially agreed such rates as appear opposite the name of each Vessel listed in Clause C(1) and such addenda as appear opposite the name of each Vessel listed in Clause C(1) and such addenda as may be executed.

## "Part II

"Clause 12. *Basic Charter Hire.* The Charterer shall pay to the Owner the basic charter hire at the monthly rate provided for in Part I hereof from the day and hour of delivery of the Vessels until and including the day and hour of redelivery to the Owner pursuant to the terms of this Agreement; or if any Vessel shall be lost, hire shall continue until the time of her loss, if known, or if the time of loss be uncertain then up to and including the time last heard from. Payment of such basic charter hire shall be made to the Owner at Washington, D. C., on delivery of the Vessel for the remainder of the calendar month in which delivery is made, and thereafter monthly in advance on the first day of each month.

"Clause 13. *Additional Charter Hire.* If at the end of the calendar year 1946, or any subsequent calendar year or at the termination of this Agreement, the cumulative net voyage profit (after the payment of the basic charter hire hereinabove specified and payment of the Charterer's fair and reasonable overhead expenses applicable to operation of the Vessels) shall exceed 10 per centum per annum on the Charterer's capital necessarily employed in the business of the Vessels (all as hereinafter defined), the Charterer shall pay over to the Owner at Washington, D. C., within 30 days after the end of such year or other period, as additional charter hire for such year or other period, an amount equal to the percentages of such cumulative net voyage profit in excess of 10 per centum on such capital computed in accordance with the following table (but such cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in any subsequent year or period):

"Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) not in excess of $100 per day—50%.

"Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) in excess of $100 per day but not in excess of $300 per day—75% on such excess over $100 per day.

"Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) in excess of $300 per day—90% on such excess over $300 per day.

"The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire and on account of any additional charter hire accrued under any War Shipping Administration Form 203 (WARSHIPDEMISE-OUT) charter prior to the times of payment provided for above or in such WARSHIPDEMISEOUT charters) at such times and in such manner and amounts as may be required by the Owner; provided, however, that such payment of additional

charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner, at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required."

5. October 29, 1946, the Commission issued Supplement 8 to General Order 60, 11 F.R. 13215, 46 C.F.R. 299.31(k), 299.49, and 299.56(b) (5), the pertinent parts of which read as follows:

"(k) *Preliminary determination and payment of 'additional charter hire.'* On or before November 30, 1946 and on or before the end of each succeeding calendar month, every charterer under a bareboat charter agreement SHIPSALESDEMISE 303 shall pay over to the Commission ninety percent (90%) of the amount then indicated to be due the Commission on account of additional charter hire under that agreement and under WARSHIPDEMISEOUT 203 (if the charterer chartered vessels from the War Shipping Administration under that form of agreement) for the period ending two calendar months prior to that date, after deducting, with respect to such payments made subsequent to November 30, 1946, the amount of any previous payments made on account of additional charter hire for the period and under the agreement involved. Such payments shall be deemed to be preliminary and subject to adjustment upon the completion of audit by the Commission covering the period involved, and neither the tender thereof by the charterer, nor its acceptance by the Commission, shall prejudice the rights of either under the applicable bareboat charter agreement or otherwise. The amounts of such payments shall be calculated in accordance with the applicable provisions of the respective agreements, particularly Clause (H) —'Special Provisions' of Part I and Clauses 13—'Additional Charter Hire' and 23—'Definitions' of Part II of SHIPSALESDEMISE 303, and Clauses 13—'Additional Charter Hire' and 23—'Definitions' of Part II of WARSHIPDEMISEOUT 203, and in accordance with these regulations. In instances where audited financial and operating statements have not been prepared by the charterer from its records or by its public accountants, tentative calculations should be prepared for this purpose."

"46 CFR 299.49:

"*Calculation of net voyage profit on cumulative basis.*

"In providing for the calculation of additional charter hire based on the cumulative net voyage profit of the Charterer, Clause 13 of Part II of SHIPSALESDEMISE 303 provides also that such cumulative net profit so accounted for shall not be included in the calculation of cumulative net profit in any subsequent year or period. Pursuant to these provisions of the bareboat charter agreements, only deficiencies in net voyage profits may be carried forward, * * *"

"46 CFR 299.56(b) (5):

"(5) That if, in any instance, the rules and regulations prescribed herein should conflict with the provisions of an applicable statute or agreement, such provisions shall govern."

6. Eastern has continuously since August 15, 1946, when it joined with other members of the American Merchant Marine Institute, Inc. in a telegram to the Commission, protested that the rates of so-called "additional charter hire" specified in Part II Clause 13 of the standard contract exceed the rate authorized by applicable law. Although Eastern executed Contract No. MC c–41881, including

Part II Clause 13, and made payments pursuant thereto, it has always relied on the Commission's assurance in Supplement 8 to General Order No. 6, particularly 46 C.F.R. 299.31(k) (1), that "neither the tender" of payments "by the charterer, nor its acceptance by the Commission, shall prejudice the rights of either under the applicable bareboat charter agreement or otherwise."

7. To date, Eastern has paid the Commission $1,125,808.06 on account of Contract No. MC c–41881. At this time it is unnecessary to state the details, or to say more than that the payments have in general, and subject to some variations, been in accord with the broad outlines of the letter of the contract.

## D. THE STATUTORY BACKGROUND

██ 1. In this litigation we are concerned with two statutes which are *in pari materia*,—The Merchant Marine Act, 1936, 49 Stat. 1985 and The Merchant Ship Sales Act of 1946, 60 Stat. 41.

2. The three provisions of the 1936 Act which are most relevant are § 207, 49 Stat. 1985, 1988, 46 U.S.C.A. § 1117, conferring upon the Commission general powers to make contracts necessary to carry on the activities authorized by The Merchant Marine Act; § 704, 49 Stat. 1985, 2008, 46 U.S.C.A. § 1194, relating to the Commission's power to charter vessels acquired by the Commission; and § 709(a), 49 Stat. 1985, 2010, providing for recapture of excess profits. The texts, so far as relevant, read as follows:

"Sec. 207. The Commission may enter into such contracts, upon behalf of the United States, as may, in its discretion, be necessary to carry on the activities authorized by this Act, in the same manner that a private corporation may contract within the scope of the authority conferred by its charter."

"Sec. 704. All vessels transferred to or otherwise acquired by the Commission in any manner may be chartered or sold by the Commission pursuant to the further provisions of this Act."

"Sec. 709. (a) Every charter made by the Commission pursuant to the provisions of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum: *Provided*, That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years.

"(b) Every charter shall contain a definition of the terms 'net voyage profit' and 'fair and reasonable overhead expenses', and 'capital necessarily employed', as said terms are used in subsection (a) of this section, setting forth the formula for determining such profit and overhead expense and capital necessarily employed, which definitions shall have been previously approved by the Commission and published in the advertisement for bids for such charter."

3. The section of the 1946 Act which is most relevant is § 5, 60 Stat. 41, 43, governing the "Charter of War-Built Vessels To Citizens", and providing for citizens' applications for charters, for the Commission's fixing of charter hire, and for the mandatory application to charters of, *inter alia*, § 709(a) of the 1936 Act. The whole text of § 5 follows:

"Sec. 5. (a) Any citizen of the United States and, until July 4, 1946, any citizen of the Commonwealth of

the Philippines, may make application to the Commission to charter a war-built dry-cargo vessel, under the jurisdiction and control of the Commission, for bare-boat use. The Commission may, in its discretion, either reject or approve the application, but shall not so approve unless in its opinion the chartering of such vessel to the applicant would be consistent with the policies of this Act. No vessel shall be chartered under this section until sixty days after publication of the applicable prewar domestic cost in the Federal Register under subsection 3(c) of this Act.

"(b) The charter hire for any vessel chartered under the provisions of this section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act, but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter). Except in the case of vessels having passenger accommodations for not less than eighty passengers, rates of charter hire fixed by the Commission on any war-built vessel which differ from the rate specified in this subsection shall not be less than the prevailing world market charter rates for similar vessels for similar use as determined by the Commission.

"(c) The provisions of sections 708, 709, 710, 712, and 713, of the Merchant Marine Act, 1936, as amended, shall be applicable to charters made under this section."

## E. INTERPRETATION OF THE RELEVANT STATUTES

1. By § 5 of the 1946 Act, and, to some extent, by § 207 and § 704 of the 1936 Act, the Commission was given power to charter Government-owned vessels of the type here in issue.

2. The first sentence of § 5(b) lays down two requirements: (1) that the Commission fix charter hire "at such rate as the Commission determines to be consistent with the policies of this Act." and (2) that "such rate shall not be less than 15 per centum  *  *  *  of the statutory sales price (computed as of the date of the charter)."  *  *  *  "except upon the affirmative vote of not less than four members of the Commission."

3. Before making any other comment, I underline the point that on the face of the statute the words "basic rate" do not appear. That term is a coinage of lawyers seeking brevity, ease of recollection, and vividness. But it may have circulated confusion. It carries an unfounded connotation of a fixed maximum-minimum formula. No such double-edged formula appears explicitly in the Act.

4. Neither the first of the two requirements in § 5(b) nor any other part of the statute requires that the Commission make its determination by regulation, or by order after notice and hearing. The situation is quite unlike the case where an administrative agency prescribes a regulation, or compels, under penal or civil sanction, adherence to a rule of conduct, or requires persons to suffer detriments, or proposes a scale of benefits. Hence there is no room for the application of such cited cases as Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 196–197, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 and Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 676, 70 S.Ct. 876, 94 L.Ed. 1194. For purposes of § 5(b) of the 1946 Act, the Commission "determines" a charter hire rate when it executes a charter contract. The execution of a particular contract implies, and adequately implies, that the Commission has determined that the rates therein stipulated are "consistent with the policies of this Act."

5. Nor does the first of the two requirements of § 5(b) imply that the Commission must use some special for-

mula, or some single measure, for fixing charter hire. If the rate "fixed by the Commission" is "consistent with the policies of this Act", the rate can be arrived at by any formula or combination of formulae. It can be a flat dollar figure; it can be a percentage of the statutory sales price; it can be a combination of a percentage of the statutory sales price and of a share in the charterer's profits. Dichman, Wright & Pugh, Inc. v. U. S., S.D.N.Y., 144 F.Supp. 922, 926, first full paragraph; United States v. East Harbor Trading Corp., S.D.N.Y., 190 F.Supp. 245, 249, second column; American Export Lines, Inc. v. U. S., Ct.Cl., 290 F.2d 925, 931, second column, second paragraph.

6. Some of the authorities just cited, and at the pages just cited, assume that if the Commission does fix the rate as a combination of a percentage of the statutory sales price and of a share in the charterer's profits, the Commission must expressly refer to its purported exercise of power under § 5(b), and perhaps that the Commission must draft the contract so as either to incorporate a reference to § 5(b) or as to make the structure and wording of the contract obviously consistent with an implied reliance on § 5(b). At least this is how I construe the passages in the opinions just cited. But if my understanding of the opinions of Judges Dimock, Kaufman, and Whitaker be correct, I disagree with them. When a corporation has a statutory power to make a contract of a particular type, and it does make such a contract, it is not mandatory that the corporation recite in the contract the statutory power. Recital is common and convenient, but nonessential. And if it be argued that not only the failure to refer to the authorizing section, but also the structure and wording of the contract (particularly, the use of the non-statutory phrase "basic charter hire") show that mistakenly the corporation and the other party both supposed that the corporation was acting under a purported and non-existent authority conferred by an inapplicable section, this argument is without weight. A mistake of that kind is not such a mistake of law as to affect the validity of the contract or the assent objectively given by the parties to the contract. It is not a mistake as to the vital question of the corporation's authority, but only as to the literary question as to the source of that authority. Nor is there the slightest ground for assuming that if the Commission had been apprized of the correct source of its authority, the Commission or the other party would have made a contract different in substance, as distinguished from wording.

7. (a) A more subtle argument, akin to the argument just rejected, is that if § 5(b) be the source of the Commission's authority to combine with a percentage of the statutory sales price a share of the charterer's profits, then the only permissible method of calculating the total obligations of the charterer under the contract is this: the charterers, first, would have to pay the Government (1) the stipulated percentage of the statutory sales price and (2) so much of the share of the charterer's profits as exceed the 50% of the excess profits stipulated by § 709(a) of the 1936 Act, and, second, would have to pay the Government 50% of the remaining profits. Dichman, Wright & Pugh, Inc. v. U. S., S.D.N.Y., 144 F. Supp. 922, 926, first full paragraph. Judges Dimock and Kaufman seem to have left the parties in the cases before them to prove if they could that they had contracted to follow that method, which these judges, as I understand them, thought permissible under the statute. But the parties apparently did not follow through on that method. They seem to have recognized that it was a method not articulated in the contract, not used by either the charterer or the Government in accounting, and not otherwise contemplated by either party.

(b) Moreover, the so-called subtle argument is not tenable. Its attempted dovetailing of the 1936 and 1946 Acts rests on inexact and illusory supports. The argument, in effect, is that the phrase "the charter hire reserved", used

in the parenthetical clause of § 709(a) of the 1936 statute, bears a close verbal correspondence to the phrase "the charter hire * * * fixed by the Commission", used in § 5(b) of the 1946 statute. Hence, so it is argued, "the charter hire reserved", as used in § 709(a) of the 1936 statute, embraces both (1) the stipulated percentage of the statutory sales price and (2) so much of the share of the charterer's profits as exceed the 50% of the excess profits stipulated by § 709(a) of the 1936 Act, if both (a) and (b) were, pursuant to § 5(b) of the 1946 statute, "fixed by the Commission" as part of "the charter hire."

(c) To this verbal argument one answer is that the phrase "the charter hire reserved" in the 1936 Act was adopted a decade before the 1946 Act used the phrase "the charter hire * * * fixed by the Commission." The 1936 phrase does not refer forward to 1946. Prolepsis is not usually part of the fair canons of statutory construction. Furthermore, the 1936 phrase does not speak to the precise problem of the meaning of a term in § 5(b) of the 1946 Act, or purport to define it, or purport to use the 1946 terminology in widening the 1936 phrase.

(d) Moreover, the mere fact that § 709(a) of the 1936 Act was, a decade later, re-enacted by § 5(c) of the 1946 statute does not change what has just been said. The re-enactment was a typical patch-work job. The draftsman wanted to make applicable to charters under the 1946 law the 50% excess profits provision of the 1936 law. Probably he did not give special attention to the phrase "the charter hire reserved", used in the 1936 statute, or stop to consider what it meant. There is not the slightest indication that it was anyone's intent to give the phrase in 1946 a broader meaning than it had in 1936. Nor is there basis for stretching the term "reserved" to include a charter hire which is merely "fixed" subject to a contingency, not set aside with the uncondi-

tional absoluteness commonly connoted by the emphatic word "reserved".

(e) A second answer to the argument is that there is no policy consideration which makes it appropriate to construe the phrase "the charter hire reserved" in § 709(a) of the 1936 statute as embracing *all* that may be exacted as "the charter hire" pursuant to § 5(b) of the 1946 statute. What § 709(a) seeks to reach is excess profits above only such part of the "charter hire reserved" as is *unconditionally* charged in the charter, (as, for example, a flat dollar rate, or a percentage of the statutory sales price of a vessel, or the prevailing world market rate for similar vessels). It does not seek to embrace any share of profits or additional payment which the Commission *conditionally* exacts from the charterer on account of any possible additional excess profit rate beyond the excess profits rate covered by § 709(a) of the 1936 Act.

(f) The Congressional excess profits capture provision in § 709(a) was, as appears on its face, designed to reach 50% of the normal profits earned by the charterer before it had deducted from such profits any sums due to the Government on account of excess profits due under an additional excess profits rate exacted by the Commission exercising its contractual powers under § 5(b) of the 1946 Act. It would not serve the Congressional design in § 709(a) of the 1936 Act, to give to the Commission a smaller percentage of additional excess profits than either the Commission, or the charterer, or an average, intelligent reader would expect from reading Contract No. MC c–41881. More important, it would produce an anomalous, unforeseen, and almost distorted application of the broad power conferred upon the Commission by § 5(b) of the 1946 Act. Suppositious figures will serve to illustrate, and, it seems to me, prove, the point. Let us suppose that cumulative voyage profits were $300 per day. Under the method proposed by what I have called the subtle argument what would happen is that the Commission would first take

$50 (representing 25% of the second and third hundred dollars) and then would take $125 (representing 50% of the remaining $250), or a total of $175. But under the method which seems to me more consonant with what Congress authorized, and what the parties contemplated, the Commission would take $50 for the first hundred dollars, and $150, or $75 each, for the second and third hundred dollars, or a total of $200.

8. In the foregoing reasoning there has been a necessary anticipation of the correct reading of § 709(a) of the 1936 Act. As I have construed § 709(a), I, in agreement with all the judges who have previously construed it, have accepted their view that its provisions are mandatory and require the Commission so to contract as to give the Government as a *minimum* 50% of the excess profits according to the prescribed formula. Dichman, Wright & Pugh, Inc. v. U. S., S.D.N.Y., 144 F.Supp. 922, 925; United States v. East Harbor Trading Corp., S.D.N.Y., 190 F.Supp. 245, 249; and American Export Lines, Inc. v. U. S., Ct.Cl., 290 F.2d 925, 930. It is a statutory section to diminish, not to increase, charterers' windfalls. It is for the benefit of the Government, and to the possible detriment of private parties. I also accept the views of my predecessors that § 709(a) does not *ex proprio vigore* give to the Commission any authority whatsoever to set a different rate than the 50% rate. In that sense, and only in that sense, it is a *maximum* provision. If some of my predecessors implied, which I do not believe that they did imply, that the letter of § 709(a) of the 1936 Act, or the overtones of that section, somehow inhibited the Commission from using § 5(b) of the 1946 Act to exact at additional excess profits rates shares of profits not denominated in § 709(a) of the 1936 Act, I would not accept that implication. Nor would I accept the view that by implication, indirection, or otherwise § 709(a) can be utilized by a charterer to pay less than it agreed by contract.

9. I have not yet dealt with another aspect of § 5(b) of the 1946 statute. The Government has argued that the contract at bar is defective because it does not follow a command in § 5(b) that it fix a charter rate not "less than the world market charter rate for similar vessels." That argument is unsound. The world market rate is mandatory only where "the affirmative vote of not less than four members of the Commission" is to charge "less than 15 percentum per annum of the statutory sales price." Dichman, Wright & Pugh, Inc. v. U. S., S.D.N.Y., 144 F.Supp. 922, 925; United States v. East Harbor Trading Corp., S.D.N.Y., 190 F.Supp. 245, 248; American Export Lines, Inc. v. U. S., Ct.Cl., 290 F.2d 925, 929–930.

10. The foregoing conclusions may be summarized to the effect that the contract at bar was valid under all relevant statutes, and represented the objective assent of the parties to the terms as there stated and here interpreted.

11. If some appellate court concludes that the statement in the immediately preceding conclusion is erroneous, it is far from clear to me that Eastern would gain any advantage. If some provisions in Part II § 13 of the charter are repugnant to the 1936 or 1946 statute, I conclude that, despite the contrary *obiter dictum* of Judge Learned Hand in Sword Line v. U. S., 2d Cir., 228 F.2d 344, 346, column 1, "no contract was ever made, because the section [§ 709(a) of the 1936 Act] made the libellant's [sic] promise unenforceable and there were therefore no mutual promises." My conclusion is based on the premise that if a statutory restriction prohibited the Commission from bargaining to recoup a larger share of excess profits than the 50% covered by § 709(a) of the 1936 Act, the Commission, so far as appears, well might have chosen to charter the vessels only if the charterer paid, say, more than 15 per centum of the statutory sales price (see Madden, J., dissenting, in American Export Lines, Inc. v. U. S.,

Ct.Cl., 290 F.2d 925, 932) or, say, the prevailing world market rates.

12. If a contract were never made, then the Government is now entitled to recover on a *quantum valebant* basis. If, as may be the situation, the fair rental value of the vessels chartered equals the 1946–1947 prevailing world market rate, the Government's quasi-contractual claim *prima facie* would be for double the charter rate, that is (according to the cross-libel) $2,298,607.00 instead of $1,125,808.06. However, no doubt, a court, mindful of principles loosely called equitable estoppel, would not readily permit the Commission to achieve by a quasi-contractual claim a larger sum than it could have received on a contractual claim if the Commission's powers had not been challenged under § 709(a).

13. This Court has not now before it testimony necessary for disposing of libelant's third cause of action, and cross-libelant's second, third, and fourth causes of action. This Court will hold a hearing to receive such testimony on Monday, March 26, 1962 at 10 A.M., unless before that date the parties stipulate for some other disposition of the aforesaid causes of action.

14. Finally, this Court notes, by way of summation, that, despite the involved pattern of statutory and contractual provisions, the dominant thread in this controversy is plain. The Government had vessels which had a fair charter hire of over 2 million dollars. It did not compel anyone to charter those vessels. Congress authorized the Commission to offer those vessels for charter. The Commission, if it followed either the method that Judge Dimock and other federal judges have believed authorized, or the alternative method that I have believed permissible, was free to fix rates which would have yielded the full 2 million dollars or more. Libelant's claim is that the Commission followed an unauthorized method. I do not agree. But if I were wrong, the error of the Commis-

sion was not that it failed to follow a Congressional mandate intended to benefit libelant or others in its class. The error was that it failed to follow a Congressional mandate requiring the Commission to collect some excess profits specifically under one section and other excess profits (if agreed upon) under another section, and to point clearly which section gave authority for each part of the charter. If the methods used by the Commission were *ultra vires*, and the rates were unauthorized, then there was no contract. And the libelant is in the anomalous position of being bound to pay the full fair value of the rental of the ships unless, as I believe, the Commission is estopped from demanding more than it was willing to take under a contract, now asserted to be vulnerable due to the most recondite technicality.

## F. ADJUDICATIONS

This Court now makes the following adjudications which at an appropriate time can be incorporated in a final judgment based upon the whole case, but which, unless counsel otherwise request, will not be now set forth in a formal, appealable, partial judgment.

1. Eastern's first cause of action in its libel is dismissed on the merits.

2. Eastern's second cause of action in its libel is dismissed on the merits.

3. Eastern's third cause of action in its libel is to stand awaiting the presentation of testimony at a plenary trial.

4. The Government's first cause of action in its cross-libel is dismissed on the merits.

5. The Government's second, third, and fourth causes of action in its cross-libel are to stand awaiting the presentation of testimony at a plenary trial.

6. Except insofar as they ask dismissal of the Government's first cause of action in its cross-libel, Eastern's "Exceptions to Cross-Libel" and its "Exceptive Allegations to the Cross-Libel" are denied, without prejudice to renewal at the plenary trial.