MASSACHUSETTS TRUSTEES OF EASTERN GAS AND FUEL ASSOCIATES, Libelants-Appellants,

v.

UNITED STATES of America, Respondent-Appellee.

No. 6035.

United States Court of Appeals First Circuit.

Jan. 8, 1963.

J. Franklin Fort, Washington, D. C., with whom James S. Eastham, William M. Brady, Boston, Mass., Israel Convisser and Kominers & Fort, Washington, D. C., were on the brief, for appellants.

Lawrence F. Ledebur, Attorney, Department of Justice, with whom Joseph D. Guilfoyle, Acting Asst. Atty. Gen., W. Arthur Garrity, Jr., U. S. Atty., and Morton Hollander and Leavenworth Colby, Attorneys, Department of Justice, were on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This libel and cross-libel in personam were brought to recover rental, or charter hire, alleged by libelants to have been overpaid, and by cross-libelant to have been underpaid, in connection with bareboat charters of merchant vessels by the former United States Maritime Commission to Massachusetts Trustees of Eastern Gas and Fuel Associates, hereinafter in the singular, Eastern. Basically the case raises the question of whether a profit-sharing lease, with a sliding scale calling for payments surpassing 50 per cent of the net voyage profits in excess of 10 per cent was unlawful. The district court held it was not, dismissed the libel, and rendered a money judgment in favor of the government on its cross-libel. Eastern appeals.

The charters were executed pursuant to the Merchant Ship Sales Act of 1946, hereinafter the 1946 Act, the most pertinent portion of which is section 5(b).

"The charter hire for any vessel chartered under the provisions of this section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act * * *, but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter). * * *" 50 U.S.C.Appendix 1738 (b).

In addition, subsection (c) of this section adopted certain provisions of the Merchant Marine Act of 1936, hereinafter the 1936 Act, the presently most important of which is section 709(a).

"Every charter made by the Commission pursuant to the provisions of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum: *Provided*, That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years." 46 U.S.C. § 1199(a).

Further provisions will be referred to later.

The original agreement, under which a number of vessels were chartered, was executed November 7, 1946. It provided for two separate types of rental. One, described as the "Basic Charter Hire" was a flat daily, sometimes called monthly, payment at the rate of 15 per cent per annum of the statutory sales price, which was the minimum amount required by section 5(b). A further paragraph, entitled "Additional Charter Hire," provided for the payment of "Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed not in excess of $100 per day—50%" (precisely in accordance with section 709(a)), but provided further that if the net voyage profit as defined exceeded $100 a day, 75 per cent of certain excess, and 90 per cent of any balance, hereinafter called the larger percentages, would be due. Eastern's operations until the termination of this charter on September 1, 1947, resulted in cumulative net voyage profits in excess of $100 per day. It paid the government some, but not all, of the larger percentages, and thereafter instituted this libel for their recovery. The government's cross-libel seeks payments of the balance.

In its brief Eastern asserts that the "'basic charter hire' was fixed by Maritime under section 5(b) of the 1946 act * * * [and the] 'additional charter hire' was a profit-sharing arrangement *fixed under section 709(a)* of the Merchant Marine Act of 1936. * * *" (ital. suppl.) The charter makes no such specification. Eastern's assertion would seem to us, at first blush, merely an employment of the device of giving a dog a bad name and then hanging him for it. If in fact the only authorization for the profit-sharing arrangement was section 709(a), it would seem only too clear that the government's case must fall. Eastern's assertion that the Commission was in that position would seem merely an attempt to assume the point in issue. However, since other courts have taken precisely this approach, we must consider it.

In American Export Lines, Inc. v. United States, Ct.Cls., 1961, 290 F.2d 925, a case involving an apparently identical lease, the court said, at p. 927, "Section 5(b) of the Merchant Ship Sales Act of 1946 * * * provided for a basic charter hire [1] to be fixed at such rate as the Commission determined to be consistent with the policies of the Act, but at not less than 15 percent of the statutory sales price * * *." 290 F.2d at 927. The court thereafter stated as one of the issues in the case, "Was the Commission authorized under section 709(a) of the Merchant Marine Act of 1936, to charge additional charter hire on a sliding scale of 50, 75 and 90 percent of the cumulative net voyage profits * * * ?" It proceeded, "As a subsidiary question, was the additional charter hire in excess of 50 per cent of the cumulative net voyage profits a part of the basic charter hire under section 5(b) of the Merchant Ship Sales Act of 1946?" 290 F.2d at 928.

The court concluded without difficulty, citing Dichman, Wright & Pugh, Inc. v. United States, D.C.S.D.N.Y., 1956, 144 F.Supp. 922, and United States v. East Harbor Trading Corp., D.C.S.D.N.Y., 1960, 190 F.Supp. 245, that section 709(a) did not authorize the charging of more than 50 per cent of the net voyage profits. With this we quite agree, as did

1. The words "basic charter hire" are contained in the charter, but are not to be found in the statute. We note this fact because the court's use of these words constitutes, in our opinion, the first turn in a wrong road. These words may be a convenient and appropriate description for certain purposes, but, as will be developed later, the court uses them for purposes of statutory construction as if they had been contained in the statute itself.

While we are on this subject we might add that Eastern is content to adopt the argument based on these words. At the same time it is indignant with the government for making a counter-argument by substituting the phrase "minimum primary rental," decrying it as "super-market and department-store terminology." Thus it all depends on whose Oxford is gored.

the court below. Then, with respect to the so-called subsidiary question, whether these larger amounts were inserted in the charter pursuant to the Commission's authority under section 5(b), the court said, "It may be the charter could have provided [this] * * * but the fact is that it did not so provide." Having thus decided that all that was done under section 5(b) was fixing 15 per cent as the "basic charter hire," the court concluded that the Commission had no further authority except what was conferred upon it by section 709(a), which section, as it had already decided, was insufficient to warrant the imposition of the larger amounts.

In Dichman, Wright & Pugh, Inc. v. United States, supra, cited by the court in American Export Lines, the court went further, in a dictum, conceding rather than stating as a "may be," that the larger amounts could legally have been imposed under section 5(b) had the Commission in fact done so. However, like American Export, the court then examined the agreement and concluded it had not done so. Finally,[1½] in United States v. East Harbor Trading Corp., supra, on a motion for summary judgment, the court adopted this dictum of the Dichman case, but held that it was a question for further proceedings to determine which section of the statute the government had in fact proceeded under.[2]

In the present case the district court, after reviewing these earlier decisions, dismissed their approach as a "recondite technicality." We must agree. The charter in no way stated that one of its paragraphs was the product of, or was inserted by virtue of, one section of the statute and the other of the other. The charter was an integrated agreement that made no reference to the statute in any particular. The Commission had a single, overall obligation to fix a charter hire.[3] It was but natural to place the formula for computing fixed, and the formula for computing contingent, rental in two separate paragraphs. Simply because the charter described the fixed charge as the "basic charter hire" and the Court of Claims[4] interpreted section 5(b) as "basic charter hire," and because the second paragraph was entitled "Additional Charter Hire" (in this case words used in section 709(a), but equally descriptive and applicable to the charter provision whether within section 709(a) or not) the court concluded that the Commission had acted outside of its authority, although conceding it might have provided exactly this, so far as substance was concerned, had it used some other form of expression.

To say that the Commission stultified itself by its choice of format is to elevate semantics above substance. Appellate courts frequently affirm district courts for being right, but for the wrong reason, and we may assume that district courts prefer this to not being affirmed at all. But the courts in the first two of these cases have reversed the Commission outright, and the third has questioned it, not for reaching an impermissable result, nor because it gave a wrong

1½. After this opinion was written our attention was called to the case of American Mail Line, Ltd. v. United States, D.C.W.D.Wash., 213 F.Supp. 152, also decided against the government. It adds nothing requiring separate discussion.

2. These district court decisions may have constituted an empty victory for the shipping companies, as it was subsequently held that a number of pending suits for recovery of such payments allegedly illegally exacted were time-barred. American-Foreign Steamship Corp. v. United States, 2 Cir., 1961, 291 F.2d 598, cert. den. 368 U.S. 895, 82 S.Ct. 171, 7 L.Ed. 2d 92. But cf. American Mail Line, Ltd.

v. United States, supra, n. 1½. We do not consider that question, however, because in the case at bar all payments have not been made.

3. It was to make contracts "in the same manner that a private corporation may contract within the scope of the authority conferred by its charter." Section 207 of the 1936 Act, 46 U.S.C. § 1117, incorporated into the 1946 Act by section 12 thereof, 50 U.S.C.App. § 1745.

4. 290 F.2d at 930–31, perhaps the best articulation of this point. Another argument is used in Dichman, Wright & Pugh, Inc. v. United States, supra.

reason, but merely because they chose to think that it had one. We cannot accept this approach. If a commission or other body is doing something it would be authorized to do, the presumption should be that it was acting within its authority. With all due respect, we think these courts have lost sight of this principle in a forest of pedagogy.

■ Eastern contends that it appears of record that the Commission in fact relied upon section 709(a), and that this fact vitiates the charters in any event. We do not so construe the record.[5] But even if the Commission failed to make an exact analysis of the separate scope of each section of the act, Eastern's conclusion would not follow. The argument goes that such action would involve a determination that the fixed rate charged under section 5(b) was "consistent with the policies of [the] Act" as that section requires, which in turn would mean, Eastern says, that to charge anything further was inconsistent with the policies of the act. We do not subscribe to this reasoning. Rather, we assume the Commission determined that this particular fixed charge was consistent provided it was accompanied by the contingent obligations elsewhere provided for. Eastern's argument would lead to the strange result that even if the Commission were authorized to conclude that the larger percentages could be appropriate charter hire in a proper case, when the Commission charged them it felt they were inappropriate. For this Eastern must carry a heavy burden of proof which we hold it has not met.

We accordingly conclude that the only question for decision is whether, in point of fact, the Commission had authority to make charters requiring the payment of more than 50 per cent of the net voyage profits. Because of their interrelationship we must consider both the 1936 and the 1946 acts. The 1936 Act

covered a number of subjects. Subchapter VII, entitled Private Charter Operation, authorized the Commission to recondition old merchant vessels, and to construct new ones, in private yards by competitive bids. The Commission was then authorized to charter such vessels by competitive bidding, section 706, 46 U.S.C. § 1196, or, in certain circumstances, without bidding, section 714, 46 U.S.C. § 1204. In the case of competitive bids the Commission was to accept, subject to certain, here irrelevant, conditions the "bidder proposing to pay the highest monthly charter hire." Section 707, 46 U.S.C. § 1197. In all cases, the Commission was to demise "upon an annual charter hire of not less than 5 per centum of the [statutorily determined foreign cost] * * * plus 3½ per centum of the depreciated foreign cost." Sections 706, 714 (as amended), 46 U.S. C. §§ 1196, 1204. Also, in both cases there was applicable section 709(a), 46 U.S.C. § 1199, entitled "Excess Profits," quoted supra, containing the 50 per cent profit obligation with which we are presently concerned.

In the 1946 Act there was substituted for competitive bidding authority in the Commission to negotiate and set rates, subject to certain floors. Section 5(b), supra. The Commission was bound by another floor as the result of the incorporation of section 709(a) of the 1936 Act. Eastern's position is that this section also set a ceiling. It states, to the point of redundance, that "shall" when used in that section was a "mandatory" word, and that a requirement that an agreement "shall" contain a certain profit-sharing obligation makes it mandatory that it not contain a greater one. We may agree that in this case "shall" was used in a mandatory sense. It does not necessarily follow, as Eastern would have us believe, that there was an implicit mandatory negative.

---

5. Essentially Eastern's argument is that the Commission constantly used the phrase "additional charter hire," and since this phrase appears in section 709(a) that is what it must have been proceeding under. "Additional charter hire" is not such a phrase of art that it must be so identified. On the contrary, it is accurately descriptive of the contingent charges no matter what was its source.

■ We start with the familiar maxim, singularly not referred to by either party, *expressio* (or *inclusio*) *unius est exclusio alterius*. It is universally held that this maxim is a guide to construction, not a positive command. This is sufficient answer to Eastern's primary contention. Whether the specification of one matter means the exclusion of another is a matter of legislative intent for which one must look to the statute as a whole. Springer v. Gov't of the Philippine Islands, 1928, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845; City of New York v. Davis, 2 Cir., 1925, 7 F.2d 566; Simmons v. County of Suffolk, 1918, 230 Mass. 236, 119 N.E. 751; Esso Standard Oil Co. v. Holderman, 1962, 75 N.J.Super. 455, 183 A.2d 454; State ex rel. Curtis v. De Corps, 1938, 134 Ohio St. 295, 16 N.E.2d 459; Industrial Trust Co. v. Goldman, 1937, 59 R.I. 11, 193 A. 852, 112 A.L.R. 1313; Attorney General of Utah v. Pomeroy, 1937, 93 Utah 426, 73 P.2d 1277, 114 A.L.R. 726; Colquhoun v. Brooks, 1888, 21 Q.B.D. 52, 65. An apt illustration that this is a matter of interpretation in each case may be found in Attorney General of Utah v. Pomeroy, supra. There the court pointed to the constitutional requirement that no person "shall be convicted of Treason unless on the Testimony of two Witnesses * * *." Could this mean, the court asked, that the government's case would fail if there were three. So, here, whether a provision that the government's price setting agent, the Commission, must provide for a recapture of 50 per cent of the net voyage profits in excess of 10 per cent means that it could not provide for more must be determined on the circumstances as a whole.

On the matter of legislative intent, some of Eastern's arguments are readily disposed of. It cites the proposition that if two statutes conflict, the specific must control the general. Hence, it says, section 5(b), which gives discretion to the Commission to fix rates, must be controlled by section 709(a), which limits that discretion in a certain particular. This does not bolster Eastern's point; it merely assumes it. In the same manner it says that section 5(b) limits the Commission's authority to charters which are "consistent with the policies of this Act," and that section 709(a) represents that policy. Again, this does not help us to construe section 709(a), but only takes us back to the starting point. The question remains, to what extent does section 709(a) seek to control section 5(b)?

■ Eastern says that if section 709(a) was not intended to set a ceiling as well as a floor, it should have contained the words "not less than." Statutes are not always drawn with such particularity, but may leave such matters to implication. Moreover, when a section is adopted bodily from some other act, care is not necessarily exercised to consider every difference which might arise under the changed conditions. We would agree with Eastern that in the 1936 Act, where section 709(a) was to be read in conjunction with section 706, section 709(a) was, as a practical matter, both a floor and a ceiling. The reason is obvious. Under section 707 competitive bids were to be judged by the "highest monthly charter hire." Hence no bidder would propose a higher profit-sharing provision than that required by section 709(a) because this would be to assume a burden to no purpose. By the same token the Commission would have no basis for imposing larger percentages. This was an understandable and desirable result. It might be difficult for the Commission, as a ministerial matter, to determine which was the "highest" bid if there were submissions varying not only in the fixed rate but in the contingency rate as well. When section 709(a) was inserted into an act which, subject to certain floors, gave the Commission itself power to set rates, it does not follow that it must be taken as reading a mandatory ceiling into that new procedure. The fact that a statute may point in a certain way when employed in one connection does not mean that it must be read exactly the same way in another connection. As we held in Sherman v. Hamilton, 1 Cir., 1961, 295 F.2d 516, cert. den. 369 U.S. 820, 82

S.Ct. 827, 7 L.Ed.2d 785, the answer depends upon the total context.[6]

Eastern makes a further argument which really goes back to the 1936 Act, but is couched in terms of construing section 709(a) in conjunction with section 5(b) of the 1946 Act. In substance it is that under section 709(a) "net voyage profits" are determined by deducting "the charter hire reserved in the charter and * * * reasonable overhead * * *." and that if the so-called larger percentages were in fact imposed under section 5(b) they would constitute part of "the charter hire reserved in the charter" and therefore would have to be so credited, with consequent confusion. It may be conceded that when section 709(a) was to be read in connection with charters made pursuant to section 706 of the 1936 Act, for reasons already discussed no larger percentages would be entailed because no bid would have included any such amounts. Possibly if Congress had been starting from scratch in 1946 it would not have devised exactly the section 709(a) language. But this does not mean that this language is inconsistent with the Commission's determination under section 5(b) to charge larger percentages. On the contrary, it seems to us that Eastern's argument is forced and unnatural. Section 709(a) required that every charter contain a provision for the payment of one half of the net profits (as therein defined) as "additional charter hire." At the same time it provided that "charter hire" was to be deducted to determine the profits. Hence, if Eastern wishes to be entirely literal, it would have to say that even as to the 50 per cent profit payment, this is part of the "charter hire" and so is ordered to be deducted. Obviously, such a strict reading of the language is absurd, for as a matter of common sense profits are not deducted in order to determine profits. Eastern naturally does not so read the language when it is considering the 50 per cent profit provision. It only seeks to do so when the percentages are larger. We do not believe that such manufactured complications show the intent of Congress.

■ In sum, we find no specific, single answer to the question of intent. We turn to more general matters. Eastern alleges that the policy of the 1946 Act was to assist the shipping industry. This may be conceded. The act had other purposes as well. The very fact that the Commission could in no case make a lease calling for less profit-sharing than is specified in section 709(a) shows that Congressional liberality was not unlimited. Even more uncompromising is

---

6. For this reason, even if Eastern's argument based upon the legislative history of section 709(a) in 1936 were sound, we would reject it. In fact it is not sound. Eastern states that a "proposal [for a sliding profit scale] was rejected, and Congress instead adopted the mandatory 50 percent profit sharing provision of section 709(a) * * *." Due to omissions this statement is highly misleading. The proposed sliding scale (which set no rates, and hence would have permitted the Commission to set even as maxima very modest amounts) was contained in section 47 of S. 4110, 74th Cong., 2d Sess. (1936), a bill introduced by Senator Guffey. But the "rejection" by the Senate Committee on Commerce, was not of the section 47 proposal, but, rather, of the entire bill, on the ground that government chartering was, per se, undesirable. The complaint was that chartering was a give-away. See S.Rep. 1721, 74th Cong., 2d Sess.

(1936). Subsequently, Senator Guffey prepared a new version of his bill, in which section 47(a) contained the language now in section 709(a) of the act. See H.R. 8555, Amendments intended to be proposed by Senator Guffey, April 24 (Calendar day, May 4), 1936, 74th Cong., 2d Sess. Senator Guffey apparently never introduced this version of his bill into the Senate. Instead, he joined with Senators Gibson and Copeland in introducing a new bill which also included a section containing the language now in section 709 (a) of the act. See 80 Cong.Rec. 9885 (1936); § 709(a), H.R. 8555, Committee, Print, June 13, 1936, 74th Cong., 2d Sess. This section was accepted without amendment. While this particular section may have been designed generally to meet "give-away" objections, we cannot draw any conclusions from this history helpful to Eastern.

the final clause in section 5(b) which provided that if the Commission in a particular case voted to charge less than the regular 15 per cent minimum provided in that section, the charter hire should in no event be "less than the prevailing world market charter rates." It is difficult to regard this as an indication of general beneficence. The reason is clear. The dominant purpose of the 1946 Act was to sell vessels, not to charter them. At all times preference was to be given to applicants proposing to purchase. Section 7(a), 50 U.S.C.App. § 1740(a). In fact a vessel could not be chartered at all until it had been advertised for sale for 60 days. Section 5(a), 50 U.S.C.App. § 1738(a). Rather than trying to temper the wind to charterers, we must conclude that the important consideration was to avoid making charters too cheap. As the court said in American President Lines, Ltd. v. United States, 3 Cir., 1959, 265 F.2d 552, 553, quoting the district court, "[I]f the hire were made too attractive the pronounced policy to demise vessels outright would be thwarted. No prudent business man would purchase a commodity which could be leased at a comparatively more favorable price." [7]

This did not mean that charterers were to be taken advantage of. Congressional aid to shippers, tangibly expressed by subsidy provisions which could cushion losses to charterers as well as to owners, remained in effect. Cf. United States v. Moore-McCormack Lines, Inc., 4 Cir., 1962, 308 F.2d 866. But certainly an intention to aid shippers did not mean that every provision in the act was to be construed against the government. We suggest that the very existence of the subsidy is a reason for not restricting the freedom given to the Commission under section 5(b) to negotiate for amply large initial charter rates.[8]

■■ In section 5(b) Congress gave the Commission discretion to charge such rates as it felt appropriate, except that it established two floors. In section 709 (a) it established another floor. These floors were specifically and unambiguously stated. Eastern's asserted ceiling exists, at best, only by implication. While we would be prepared to find such an implication if it seemed called for, we believe that limitations upon an otherwise general grant of power should not lightly be inferred. Springer v. Gov't of the Philippine Islands, supra; cf. Esso Standard Oil Co. v. Holderman, supra; State ex rel. Curtis v. De Corpus, supra. Viewing this statute as a whole our disposition is against doing so. We accept the assumption, or conclusion, of the three cases initially discussed, and hold that the Commission was authorized to include the larger percentages in the charters.

■ Although we have reached this decision independently we do not wish, by silence, to deny the validity of certain other of the government contentions, particularly its point that in case of ambiguity it is appropriate to give weight to the view of the body entrusted to administer the act. American Power & Light Co. v. S. E. C., 1 Cir., 1944, 141 F.2d 606, aff'd, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103; West Texas Utilities Co. v. N. L. R. B., D.C.Cir., 1950, 87 U.S.App. D.C. 179, 184 F.2d 233, cert. den. 341 U. S. 939, 71 S.Ct. 999, 95 L.Ed. 1366; North American Utility Securities Corp.

7. The phrase "consistent with the policies of this Act," which Eastern argues means, "be kind to shippers," not only may refer to this other purpose, but there is evidence that in fact it was so intended. "Inasmuch as the policy of the measure is to put as many war-built vessels as possible into private ownership, the Commission is directed not to approve applications to charter unless such chartering is consistent with the policies of the Act." S.Rep. No. 807, 79th Cong. 1st Sess. 13 (1945).

8. Actually, the government makes a persuasive argument that within the framework of this act it could be to the advantage of shippers to permit the Commission to charge more than 50 per cent of graduated profits, for if it could not do this it might feel called upon to demand a larger fixed fee. If a venture proved unsuccessful, the higher fixed rate could obviously be disastrous.

v. Posen, 2 Cir., 1949, 176 F.2d 194. One cannot fail to be impressed by the attention which the Commission gave to the desirability of charging the larger percentages and to the reasons which motivated it. However, we regard this as unnecessary to our decision.

 The second aspect of the case is Eastern's contention that the Commission had no power to change the basis of accounting, and hence worsen its position under the charter, in September 1947, by terminating the charter and granting a new one.[9] Since the charter was terminable at will, this change was normally the Commission's right. Gebhard v Royce Aluminum Corp., 1 Cir., 1961, 296 F.2d 17. Eastern's complaint is bottomed on the argument we have already considered, that section 709(a) was for the benefit of shippers and set a ceiling upon the Commission's authority with respect to profit-sharing agreements. This part of its case must fall with the other.

Finally, Eastern makes a separate contention with respect to two single voyage subcharters made by Eastern just before September 1, 1947 and consented to by the Commission pursuant to a clause in the charter requiring its consent to any subcharter or assignment. Eastern takes the position that, irrespective of section 709(a), this assent prevented the Commission from terminating or modifying the charter with respect to these two vessels until these voyages had been completed. The provision requiring the Commission's assent was inserted for the government's benefit, not for Eastern's. Indeed, Eastern agrees that the Commission might have terminated the charter outright on September 1 in spite of this assent. In that case Eastern would have been under no obligation to the subcharterers because their agreements contained a provision releasing Eastern in case of "frustration," and an outright termination of the charter would have been obvious frustration.

Eastern's point is that the Commission's grant of a new charter, although on different terms, deprived it of this defense, and consequently the government should be held to the original charter. We cannot believe that the Commission's permitting Eastern to make a subcharter was intended as an enlargement of Eastern's rights.

Judgment will be entered affirming the judgment of the District Court.

---

9. Eastern says in reality the Commission rewrote the charter. Whether this is the substance of the matter makes no present difference.