United States Commissioner

**UNITED STATES of America, Libellant,**

v.

**EASTPORT STEAMSHIP CORPORA-TION and Seaboard Surety Company, Respondents.**

United States District Court
S. D. New York.
April 8, 1963.

Robert M. Morgenthau, U. S. Atty., for libellant; Louis E. Greco, Atty. in Charge Admiralty & Shipping Section Dept. of Justice, Leavenworth Colby, Louis E. Greco, Daniel E. Leach, Lawrence F. Ledebur, Attys., Admiralty & Shipping Section, Dept. of Justice, of counsel.

Zock, Petrie, Sheneman & Reid, New York City, Kominers & Fort, Washington, D. C., for respondents; Francis J. O'Brien, New York City, J. Franklin Fort, T. S. L. Perlman, Washington, D. C., of counsel.

LEVET, District Judge.

This libel by the United States seeks $17,777.68 allegedly due as "additional charter hire" under a bareboat charter of SS Denison Victory from The Maritime Administration, as owner, to the respondent Eastport Steamship Corporation (Eastport), as charterer.[1]

The controversy centers about the charter hire provisions contained in Part I Clause E and Part II Clauses 12 and 13 of Charter No. MA–31, dated February 26, 1951, a standard bareboat charter contract of the Maritime Commission.

At a hearing held March 12, 1963, the parties stipulated that the trial record consist of those matters previously submitted to the court on the respondent's motion for summary judgment. After considering this record as stipulated to by the parties, the court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The court has jurisdiction of the parties and the subject matter of this action.

2. On February 26, 1951, Eastport entered into Contract MA–31 with the Maritime Administration for the bareboat charter from the United States to Eastport of the SS Denison Victory, a type VC2–S–AP2 dry-cargo victory ship. (Rothchild Aff. p. 1; Res. Ex. 22) Contract MA–31 was a standard form bareboat charter, denominated "Shipsales-demise 303." The vessel was allocated to Eastport, upon its application for a bareboat charter by a telegram from the Maritime Administration to Eastport dated February 23, 1951. (Res. Ex. 23)

3. The vessel was delivered to Eastport under the charter on March 5, 1951. Eastport operated the Denison Victory upon three voyages under two subchar-

---

1. Eastport's surety on its performance bond, Seaboard Surety Company, is a co-respondent.

ters to the United States Department of Agriculture as agent for the Economic Cooperative Administration. The first subcharter, dated February 27, 1951, provided for a single voyage for the carriage of grain from New York to Trieste, Yugoslavia. (Res. Ex. 24) The second subcharter, dated March 3, 1951, provided for two consecutive voyages for the carriage of grain from North Atlantic ports in the United States to Adriatic sea ports.

4. The Denison Victory was redelivered to the Maritime Administration on August 20, 1951 for a total charter of 168 days.

5. The charter provided for hire in the following clauses:

## "PART I

"Clause E. *Rate of Basic-Hire.* Unless otherwise specifically agreed, basic hire shall be paid at the rate appearing opposite the name of each Vessel listed in Clause C(1)[2] and such addenda as may be executed.

## "PART II

"Clause 12. *Basic Charter Hire.* The charterer shall pay to the Owner the basic charter hire at the monthly rate provided for in Part I hereof from the day and hour of delivery of the Vessels until and including the day and hour of redelivery to the Owner pursuant to the terms of this Agreement; or if known, or if the time of loss be uncertain then up to and including the time last heard from. Payment of such basic charter hire shall be made to the Owner at Washington, D. C., on delivery of each Vessel for the remainder of the calendar month in which delivery is made, and thereafter monthly in advance on the first day of each month."

"Clause 13. *Additional Charter Hire.* If at the end of the calendar year 1951, or any subsequent calendar year or at the termination of this Agreement, the cumulative net voyage profit (after the payment of the basic charter hire hereinabove specified and payment of the Charterer's fair and reasonable overhead expenses applicable to operations of the Vessels) shall exceed 10 per centum per annum on the Charterer's capital necessarily employed in the business of the Vessels (all as hereinafter defined), the Charterer shall pay over to the Owner at Washington, D. C., within 30 days after the end of such year or other period, as additional charter hire for such year or other period, an amount equal to the percentage of such cumulative net voyage profit in excess of 10 per centum per annum on such capital computed in accordance with the following table (but such cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in any subsequent year or period);

"Cumulative net voyage profit (in excess 10% per annum on capital necessarily employed) not in excess of $100 per day—50%.

"Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) in excess of $100 per day but not in excess of $300 per day—75% on such excess over $100 per day.

"Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) in excess of $300 per day—90% on such excess over $300 per day.

"The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire at such times and in such manner and amounts as may be required by the Owner; provided, however, that such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final

2. Clause C(1) fixed the "Basic Hire Per Calendar Month" at $12,237.50.

audit by the Owner, at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required." (Res. Ex. 22)

6. Maritime's "final accounting" of Eastport's operations, dated January 29, 1954, showed profits of $88,472.37 and calculating additional charter hire due in the amount of $67,865.13, of which $17,777.68 remains unpaid. (Res. Ex. 27)

## DISCUSSION

The charter established the hire as the sum of a fixed monthly rate called "basic charter hire" and a percentage of the charterer's profits, called "additional charter hire." The "basic charter hire" was set at a monthly rate equal to 15 per cent per annum of the statutory sales price, the minimum amount required by Section 5(b). The "additional charter hire" was established at 50, 75

and 90 per cent of the charterer's net voyage profit in excess of 10% return on capital necessarily employed.

Eastport has paid the basic charter hire and concedes its obligation to pay 50 per cent of its total profits as additional charter hire. It denies the libellant's claim for the amount in excess of 50 per cent of its profits, contending that these provisions in the charter are without statutory authority.

The charter was executed under Section 5 of The Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.App. § 1738 governing the "Charter of War-Built Vessels to Citizens." [3] Subsection (c) of Section 5 incorporates certain provisions of The Merchant Marine Act of 1936, 49 Stat. 1985, as amended, 46 U.S.C. §§ 1101–1294, the most pertinent provision of which is Section 709(a).[4]

By Section 5(b), Congress authorized the Commission to establish charter hire "at such rate as the Commission determines to be consistent with the policies

---

3. "(a) Any citizen of the United States and, until July 4, 1946, any citizen of the Commonwealth of the Philippines, may make application to the Commission to charter a war-built dry-cargo vessel, under the jurisdiction and control of the Commission, for bareboat use. The Commission may, in its discretion, either reject or approve the application, but shall not so approve unless in its opinion the chartering of such vessel to the applicant would be consistent with the policies of this Act. No vessel shall be chartered under this section until sixty days after publication of the applicable prewar domestic cost in the Federal Register under subsection 3(c) of this Act.

"(b) The charter hire for any vessel chartered under the provisions of this section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act, but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter). Except in the case of vessels having passenger accommodations for not less than eighty passengers, rates of charter hire fixed by the Commission on any war-built vessel which differ from the rate speci-

fied in the subsection shall not be less than the prevailing world market charter rate for similar vessels for similar use as determined by the Commission.

"(c) The provisions of sections 708, 709, 710, 712, and 713, of the Merchant Marine Act, 1936, as amended, shall be applicable to charters made under this section."

4. "(a) Every charter made by the Commission pursuant to the provisions of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charter's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum: Provided, That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years."

of [the 1946] Act." The Commission was limited to the extent that it could not establish a charter hire at *less than* "15 per centum per annum of the statutory sales price," except upon the affirmative vote of four members of the Commission. If it did establish a rate below 15 per cent, that rate could, in no event, be less than the prevailing world market charter rate. But no maximum was set by this section.

Subsection (c) made applicable to the charters under the 1946 Act Section 709(a) of the 1936 Act, which provided that in every charter made pursuant thereto "the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum." It is the statutory construction of this Congressional patchwork that poses the issue in this case.

As always in cases of statutory construction, "there is a fair contest between two readings, neither of which comes without respectable title deeds"[5] and involves "a choice between uncertainties." (Burnet v. Guggenheim, 288 U.S. 280, 288, 53 S.Ct. 369, 77 L.Ed. 748 (1933)). All of the courts which have considered this question have agreed upon two propositions: first, under Section 5(b) Maritime would be authorized to impose the additional charter hire contained in Clause 13 of the charter; second, under 709(a) it would not. Massachusetts Trustees of Eastern Gas & Fuel Assoc. v. United States, 312 F.2d 214 (1 Cir., 1963), affirming, 202 F.Supp. 297 (D.Mass.1962); American Export Lines, Inc. v. United States, 290 F.2d 925 (Ct.Cl.1961); American Mail Line Ltd. v. United States, 213 F.Supp. 152 (W.D.Wash.1962); United States v. East Harbor Trading Corp., 190 F.Supp. 245 (S.D.N.Y.1960); Dichman, Wright & Pugh, Inc. v. United States, 144 F.Supp. 922 (S.D.N.Y.1956). Beyond this unanimity ends and the courts take divergent views, occasioned by the necessity of a composite reading of a statute containing both Sections 5(b) and 709(a). The Dichman, East Harbor, American Export and American Mail cases hold that Maritime's intent to act under one or the other of the sections is determinative. The Eastern Gas cases hold Maritime's intent immaterial and the statute, construed *in pari materia*, authorizes Maritime's actions.

Holding that one provision authorizes the sliding scale and another does not, when both are in the same section of the statute, introduces into the problem an unnecessary dichotomy. The issue is not whether Maritime did, in fact, act under subsection (b) or (c), but, rather, Maritime's authority under the statute read as a whole. Clearly, the incorporation in subsection (c) of Section 709 of the 1936 Act requires the provisions to be read *in pari materia*. As Justice Cardozo said: "[T]he meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view. * * *" Panama Refining Co. v. Ryan, 293 U.S. 388, 433, 439, 55 S.Ct. 241, 254, 256, 79 L.Ed. 446 (dissenting opinion). And again, "[t]here is need to keep in view * * * the structure of *the statute, and the relation, physical and logical, between its several parts.*" Duparquet Huot & Moneuse Co. v. Evans, 297 U.S. 216, 218, 56 S.Ct. 412, 413, 80 L.Ed. 591 (1936).

■ After reviewing the decisions holding Maritime's intent to be determinative, I agree with the First Circuit in the Eastern Gas case, that Maritime's intent is immaterial. What is at issue is Maritime's authority under the statute read as a whole, not its intention to act under one or the other of its subsections. "We accordingly conclude that the only question for decision is whether, in point of fact, the Commission had authority to make charters requiring the payment of more than 50 per cent of the net voyage profits." Eastern Gas, supra, 312 F.2d 214. Thus parsed, the issue is: To what extent does Section 709(a) limit

5. Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527 (1947).

the authority of the Commission under Section 5(b) to establish a sliding scale charter hire provision?

The difficulties in answering this question are directly attributable to the fact that the 1936 and 1946 Acts provided basically different methods of chartering. The 1936 Act authorized the Maritime Commission [6] to charter government vessels by competitive bidding, Section 706, 46 U.S.C. § 1196, or in certain instances, without bidding, Section 714, 46 U.S.C. § 1204. In the case of competitive bidding, the Commission was to accept, subject to certain conditions, the "bidder proposing to pay the highest monthly charter hire." Section 707, 46 U.S.C. § 1197. In all cases Section 709(a), 46 U.S.C. § 1199, was applicable, which provided for the 50 per cent profit division. In the 1946 Act competitive bidding was done away with and the Commission was given authority to set charter hire at such rates as the Commission thought "consistent with the policies of [the 1946] Act." But Congress incorporated Section 709(a) into the 1946 Act. Unfortunately, prolepsis was not a Congressional virtue.

In support of its contention that Section 709(a) bars the imposition of additional charter hire at a rate other than 50%, the respondent proffers two arguments. First, Section 709(a) imposes on Maritime a mandatory maximum provision for additional charter hire in accordance with the statutory scheme of the 1936 Act. Second, if the sliding scale hire were authorized by Section 5(b), it would have to be deducted before computing the 50% under Section 709(a).

Each of respondent's contentions was adequately, and I believe correctly,

dealt with in the sound and well-reasoned opinion of Judge Wyzanski in Eastern Gas, 202 F.Supp. 297, and in the opinion of the Court of Appeals affirming Judge Wyzanski (1st Cir. 1963), 312 F.2d 214. Further exposition by me is unnecessary since I agree with the rationale of these opinions. Accordingly, on the authority of the opinions in Massachusetts Trustees of Eastern Gas & Fuel Assoc. v. United States, the libellant is entitled to a decree with costs.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of this action.

2. The parties executed a valid and binding charter party.

3. The provisions for charter hire contained in Charter No. MA–31 were authorized by Section 5 of The Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.App. § 1738. Massachusetts Trustees of Eastern Gas & Fuel Assoc. v. United States, 312 F.2d 214 (1st Cir., 1963), affirming 202 F.Supp. 297 (D.Mass.1962).

4. The libellant is entitled to a decree sustaining its claim against respondent with costs.

Submit on notice a decree in accordance with the foregoing. If the parties agree as to the amount to be inserted, a final decree may be entered. If agreement is not possible, an interlocutory decree should be submitted providing for a reference to a Commissioner to determine the amount. The question of interest will await the signing of a final decree and counsel are requested to submit memoranda on that question.

6. On May 24, 1950, the Maritime Administration succeeded to the functions of the Maritime Commission (Reorganization Plan 21 of 1950, 64 Stat. 1273).