**AMERICAN PRESIDENT LINES, LTD.,**
a corporation, Libelant,

v.

**UNITED STATES of America,**
Respondent.

**UNITED STATES of America,**
Libelant,

v.

**AMERICAN PRESIDENT LINES, LTD.,**
et al., Respondents.

Nos. 28426, 28705.

United States District Court
N. D. California, S. D.

Oct. 10, 1963.

---

Peter N. Teige, George D. Wick, Jr., San Francisco, Cal., J. Franklin Fort,

Kominers & Fort, Washington, D. C., for American President Lines, Ltd.

Cecil F. Poole, U. S. Atty., Keith R. Ferguson, Special Asst. to the Atty. Gen., Lawrence F. Ledebur, John F. Meadows, Ralph F. Bagley, Attys., Admiralty & Shipping Section, Dept. of Justice, San Francisco, Cal., for the United States.

WEIGEL, District Judge.

These cases involve a bareboat charter under which American President Lines, Ltd. (hereafter "APL") commercially operated numerous Government owned cargo vessels during the years 1946–1955. APL alleges that the charter provided for illegally excessive rates of hire based on erroneous interpretations of pertinent statutes by the United States Maritime Commission and its successor agency, the Maritime Administration (hereafter sometimes collectively referred to as "Maritime"). APL accordingly seeks a declaratory judgment of its nonliability to the Government's demand for some two million dollars. The Government, denying illegality, libels APL and its surety for the hire allegedly due.

APL moves for summary judgment, the parties having filed numerous affidavits and exhibits. There being no genuine issue of material fact, the cases are ripe for decision. The libels are within this Court's jurisdiction. Sword Line, Inc. v. United States, 351 U.S. 976, 76 S. Ct. 1047, 100 L.Ed. 1493 (1956); Luckenbach Steamship Co. v. United States, 312 F.2d 545 (2d Cir., 1963).

The legal issues stem from the provisions of the charter referred to at the outset. It is one of the standard "Form No. 303–SHIPSALESDEMISE" charters used in leasing out Government vessels to private operators under the Merchant Ship Sales Act, 1946, 50 U.S.C. App. §§ 1735–1746. Some history of this standard charter and of the litigation about it are set forth in American-Foreign Steamship Corp. v. United States, 291 F.2d 598 (2d Cir., 1961), certiorari denied 368 U.S. 895, 82 S.Ct. 171, 7 L.Ed.2d 92 (1961), and in Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States, 312 F.2d 214 (1st Cir., 1963).

For the purposes of this memorandum, other relevant matters will be set out or indicated in connection with the issues to which they relate. There are five issues to be considered. The first is major and central.

1. *The "sliding scale" or "progressive profit-sharing" issue.*

The Merchant Ship Sales Act, supra, empowered Maritime to reject or approve applications for charter of the type of vessels here involved. (Sec. 5(a), 50 U.S.C. App. § 1738(a)). Ensuing statutory provisions regarding charter hire underlie the principal controversy between the parties here and the conflict of authority among the courts which have passed upon the same question in other cases. Those provisions are these:

MERCHANT SHIP SALES ACT OF 1946

[50 U.S.C. App. § 1738]

*"Charter of War-Built Vessels to Citizens*

"Sec. 5. * * *

"(b) The charter hire for any vessel chartered under the provisions of this section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act, but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter). Except in the case of vessels having passenger accommodations for not less than eighty passengers, rates of charter hire fixed by the Commission on any war-built vessel which differ from the rate specified in this subsection shall not be less than the prevailing world market charter rates for similar vessels for similar use as determined by the Commission.

"(c) The provisions of sections 708, 709, 710, 712, and 713, of the

Merchant Marine Act, 1936, as amended, shall be applicable to charters made under this section."

MERCHANT MARINE ACT, 1936
[46 U.S.C. § 1199]

"Sec. 709. (a) Every charter made by the Commission pursuant to the provisions of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum: *Provided,* That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years."

The charter before the court provides, as to rates, for (1) a monthly firm or fixed "basic charter hire" of at least 15 per centum per annum of the vessels' statutory sales prices, plus (2) a contingent annual "additional charter hire" of from 50 to 90 percent of the charterer's cumulative net voyage profit in excess of ten per centum per annum of the capital necessarily employed in the charter operations.

■ This court holds that the challenged sliding scale is contrary to the governing statutory provisions. In so holding, I have considered the conflicting decisions on the question, all of which will be later cited, as well as the able advocacy, written and oral, of counsel expert on the issues. I would not add to the welter of words on the subject were it not for my conviction that the question is not close and that exposition of the reasons underlying this conclusion

may be useful in the ultimate resolution of the conflict in authority.

■ At the threshold, I am unable to find any critical or, indeed, significant inconsistency between Section 5(b) and Section 709(a). The meaning of the words in these sections is clear. They make sense as part of a statutory purpose and plan within the province of the Congress. The judicial function, broad though it be, does not properly include substitution of the views of a court for those of Congress on economic and business questions. Judicial restraint in areas such as these is the measure of judicial wisdom, if, indeed, in an ultimate sense, not of judicial authority.

Section 5(b) begins by authorizing the Commission to fix charter hire "at such rate as the Commission determines to be consistent with the policies of this Act * * *". This grant of authority is then limited in three respects.

The first limitation is that the rate of charter hire shall not be less than 15 per centum per annum of the statutory sales price, computed as of the date of charter, except upon the affirmative vote of no less than four members of the Commission. This limitation, contained in the first sentence of § 5(b), is not involved in this case because the charter here requires a hire of at least the 15 percent requisite to avoid application of the limitation.

The second limitation is to the effect that the rates of charter hire fixed by the Commission shall, if they "differ from the rate specified", not be less than the prevailing world market charter rates. This limitation, set out in the second sentence of § 5(b), is not here involved because the rate provided in the charter does not so differ.

The third limitation stems from the statutory declaration of Section 5(c) requiring that the provisions of Section 709(a) "*shall* be applicable to charters made under" Section 5(b) (emphasis added). The charter here is undeniably one made under Section 5(b). No one has suggested that there is any other

authority for it, and there is none. It is plain, therefore, that the provisions of § 709(a) apply. Congress could hardly have used language more clearly so requiring.

It is perhaps worthy of note here that, while the first two limitations upon the authority granted the Commission are stated as exceptions, the limitation imposed by Section 5(c) is stated positively and affirmatively through employment of the command "shall". It would hardly seem appropriate to treat a positive command as having less force in specifying a qualification upon a grant of power than a statement or statements qualifying that grant in the form of exceptions.

What, then, is the limitation upon the authority of the Commission thus made applicable by explicit command? It is a declaration in § 709(a) which spells out in detail those provisions which must be included in *"Every charter made by the Commission* pursuant to the provisions of this title * * *"* (emphasis added). When examination is made of the provisions which Congress had thus declared requisite to every charter made by the Commission, we find an unambiguous, carefully worded and easily understood statement that every charter shall provide that "the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum * * *". Congress was careful and exact in its designations in § 709(a) as to what it meant by the terms used in the quoted phrase.

Summarizing, the mandate of Congress relevant to the charter now before the court is this:

> The provisions of Section 709(a) *shall* be applicable and, accordingly, the charter *shall* provide that the charterer shall pay over to the Commission, *as additional charter hire,* one-half of cumulative net voyage profit in excess of 10 per centum per annum.

The words "as additional charter hire" obviously mean charter hire in addition to that provided for by the Commission in exercise of its authority under Section 5(b). To hold otherwise is judicial amendment striking those words out of the statute. To hold that the words "shall pay over to the Commission * * * one-half of * * * cumulative net voyage profit" means that the cumulative net voyage profit to be paid *shall not be less than* one-half thereof is judicial enactment into the statute of a concept and words which are not there. It cannot reasonably be contended that Congress did not know how to specify a minimum when it so intended. It did that very thing in this very statute by the requirements, in Section 5(b), that the charter rate "shall not be less than" 15 percent of statutory sales price except upon the affirmative vote of "not less than four members of the Commission" as well as by the requirement therein that the charter rate under certain circumstances "shall not be less than" the referenced prevailing world market rates.

Why should plain language be disregarded? Why should Congressional draftsmanship be demeaned or attacked? Why should escape be sought from the plain meaning of plain words predicated upon inconclusive assumptions as to the history or purpose of the legislation? In putting these questions, it is not suggested that APL, as the charter has worked out, has not profited. However, this result has stemmed, it seems to me, from the economic vagaries and imponderables in chartering. The annual operations under this charter under the same management fluctuated, during a period of some nine years, from a loss in one year of $387,916.47 to a profit of $5,451,001.88 in another. There is no evidence to indicate that Congress was any less aware of the feast and famine characteristics of the shipping business than the Commission.

Congress, by the provisions of Section 5(b), Section 5(c) and Section 709(a) here operative said to Maritime, in effect: "You may charter at 15 percent or more per annum of statutory sales

price, but you must also include a provision for payment, as additional charter hire, of one-half of cumulative net voyage profit as such provision is spelled out in Section 709(a) of this statute."

If, as it has been urged and is true, a purpose of the statute was to encourage sale as against charter, the Commission was given ample scope so to encourage by its broad power to fix the annual charter hire at any rate it wished over 15 per centum of statutory sales price. A high, non-contingent rate of charter hire would surely be more effective in inducing sale than a contingent rate, however high, preconditioned upon the making of a profit in excess of 10 percent of invested capital.

Moreover, the requirement of equally dividing cumulative net voyage profit between the Commission and the charterer may well be advantageous to the government of the United States and serviceable to proper Congressional purposes. There are interlocking relationships between revenue from charter hire on the one hand and, on the other, costs of shipping, including costs of shipping which must be borne by governmental agencies. While one purpose of the statute was to encourage sale over charter, there were other objectives calling for a balancing, such as, for example, encouragement of a thriving American Merchant Marine for the purposes of defense, full employment and the like. The provisions of § 709(a) requiring, in effect, that charterers should receive 50 percent of certain profits make good sense in that interest. Furthermore, while the connection may not be direct and applicable in all cases, profit enjoyed by a domestic shipping company surely has some relation to its need for government largesse in terms of subsidies.

It may be that a Congressional enactment permitting the Commission to do what it has done in this charter would more effectively have promoted the policies of the Act. But that supposition, even if amounting to conviction, does not justify disregarding the mandate of Congress.

We have here, then, a statutory scheme which is clear. There is a grant of power to the Commission. It is not an unqualified grant. It is qualified by two exceptions (neither applicable here) and by an express requirement (very much applicable here). Nothing in the facts preclude application of the statute as written and enacted by the Congress of the United States. Congress might have provided more wisely than it did, although that is subject to reasonable debate. In any case, we are not concerned with the wisdom of what Congress did. There is no contention here, nor could there be any reasonable one, that Congress acted beyond its authority.

In short, in the absence of reasons far more compelling than any here present, it seems unwise, indeed, to hold that Congress meant something different than it plainly said.

The holding here, it should be underscored, is not that the Commission proceeded under the wrong section or sections of the statute or that it could have exacted the charter hire it undertook to require here by the use of different language in its forms. The holding here is that Maritime was bound by a clear requirement imposed by Congress in its proper exercise of legislative power. And, of course, the holding here is not that the Commission acted in any way in bad faith nor with any intent other than to acquit its responsibilities in the highest public interest.

As noted earlier, other courts have reached a different conclusion or have reasoned differently in arriving at the same result. I am most grateful to the learned authors of the opinions in those decisions because study and re-study of their views generated whatever merit there may be in those outlined above. The cases are: American Export Lines, Inc. v. United States, 290 F.2d 925 (Ct. Cl., 1961); American Mail Line, Ltd. v. United States, 213 F.Supp. 152 (W.D. Wash., 1962); Dichman, Wright & Pugh, Inc. v. United States, 144 F.Supp. 922 (S.D.N.Y., 1956); Massachusetts Trustees of Eastern Gas and Fuel Asso-

ciates v. United States, supra, affirming the decision reported in 202 F.Supp. 297 (D.Mass., 1962); and United States v. Eastport Steamship Corporation, 216 F. Supp. 649 (S.D.N.Y., 1963). See, also: United States v. East Harbor Trading Corp., 190 F.Supp. 245 (S.D.N.Y., 1960) and Sword Line v. United States, 228 F. 2d 344 (2d Cir., 1955), aff'd on rehearing 230 F.2d 75, aff'd as to jurisdiction 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493 (1956).

2. *The estoppel and "January 30, 1959, letter agreement" issue.*

■ APL is not estopped from limiting its liability for cumulative net voyage profits to the one-half specified by § 709(a). In the first place, I construe the final proviso of Clause 13 of the charter here to constitute a reservation of rights by the charterer which effectively forecloses any claim of estoppel. The text of the clause as well as a thorough-going review of its history and significance are set out in Judge Friendly's dissent in American-Foreign, supra, 291 F.2d 598 commencing at page 613. Judge Friendly's interpretation there appears to me to be unassailable as does that of Judge Beeks in construing the same clause in American Mail Line, supra.

While it seems clear to me, without more, that there is no estoppel against APL, the latter's letter of January 30, 1959 to the Commission (made an agreement by the Commission's written acceptance) has cumulative relevance here as well as to APL's request for a protective order regarding certain charter hire payments keyed to the time of the making of subsidy payments to APL.

In January 1959, there was approximately $8,000,000 of accrued subsidy due from Maritime to APL, and about $7,700,000 of charter hire due Maritime, on various charters, a portion of which was in dispute. In order to provide for an orderly liquidation of these accounts, and because of the existing dispute, the parties executed a letter-agreement on January 30, 1959, which provided that when a subsidy payment was made to APL, the latter would make a payment to Maritime of equal amount to be applied first in liquidation of undisputed charter hire, and then to hire which was in dispute. To avoid the arguments advanced in American-Foreign Steamship Corp., supra, that such disputed payments would be voluntary and unrecoverable, the agreement said in part:

4. * * * It is agreed that such payments shall be without prejudice to or effect upon the rights and claims of either party, and that such payments shall not be considered to be a voluntary payment in acceptance of the position of the United States with respect to any such unresolved or disputed item.

Since payments of disputed hire may shortly be made on the charter here in litigation, APL asks that the agreement be declared valid. The Government contends that it is without consideration and therefore ineffective.

■ The agreement was admittedly executed by an authorized official of the Administration, and APL undertook thereby to make payments of hire which it might otherwise withhold because of the existence of a bona fide dispute. It was therefore supported by consideration and valid. See: 17 C.J.S. Contracts § 110; Richfield Oil Corp. v. United States, 248 F.2d 217, 223 (9th Cir., 1957); Pittsburgh Testing Lab. v. Farnsworth & Chambers Co., 251 F.2d 77, 79 (10th Cir., 1958); Board of Education of City of Albuquerque v. American Nat. Bank, 294 Fed. 14, 19 (8th Cir., 1923); United States v. Westmoreland Manganese Corp., 134 F.Supp. 898, 910 (E.D.Ark., 1955), aff'd, 246 F.2d 351 (8th Cir., 1957); Maco Warehouse Company California v. United States, 169 F.Supp. 494, 500, 144 Ct.Cl. 538 (1959); In re New York, O. & W. R. Co., 178 F.2d 765, 766 (2d Cir., 1950).

3. *The "split accounting" or "Foreign Trade Addendum" issue.*

■ APL states that Section 709(a) calls for additional charter hire to be

**194**

computed on an *annual* basis. It alleges that Maritime violated that command by requiring an agreement calling for additional charter hire from voyages after September 1, 1947, to be computed separately from that of voyages prior to that date.

The facts compel rejection of APL's argument. The real issue here is not as to the period or periods for computation of additional charter hire. It is as to the term of charters.

Maritime notified all charterers on August 15, 1947, that it was exercising the right (reserved in the charters to both parties) to terminate chartering on 15-days' notice. Some charterers requested Maritime to devise new terms and conditions for acceptance in lieu of termination. On August 20, 1947, Maritime announced such new terms (including a requirement for separate accounting after September 1, 1947), but stated that the original termination notice would stand, absent acceptance of the new agreement.

APL voluntarily sought and obtained such a new agreement ("Foreign Trade Addendum"). The new agreement expressly stated it was "a *separate* charter between the parties." There is no evidence that APL's acceptance of the new agreement was unlawfully forced. Nor were Section 709(a)'s calendar year accounting requirements violated; they do not provide that two *separate* charters within one year must be combined for accounting purposes. See Massachusetts, supra, 312 F.2d at 223.

#### 4. *"Cumulative accounting" issue.*

█ This issue calls for determination of the proper accounting period or periods for cumulation of profits and losses in establishing liability for additional charter hire which may be payable under Section 709(a). Resolution requires construction of the following language of that Section (the entire Section is set out, supra, at page 190):

"Every charter * * * shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits * * * shall exceed 10 per centum per annum on the charterer's capital necessarily employed * * *, the charterer shall pay over to [Maritime], as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum: *Provided,* That the cumulative net [voyage] profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years."

The positions of the parties, as set out in greater detail below, are these: Maritime has long interpreted this Section as calling for payment whenever, at the end of any calendar year of the charter, excess profits have cumulated from the starting date of the charter or, as the case may be, from the start of the calendar year following the last payment of additional charter hire. APL contends that any payments made on this basis are tentative, and that final liability for additional charter hire is to be determined at the end of the charter after cumulation of profits and losses over the life of the entire charter period.

This court has concluded that Maritime's interpretation, now to be more fully spelled out, is correct. Taking the commencement of the term of the charter as the starting date of the period of computation, no additional charter hire is payable until the end of an ensuing calendar year (whether the first following the starting date or a later one) when, cumulating profits and losses for the entire intervening period, the accounting shows that the requisite excess profits have accrued. A profit payment is then to be made to Maritime and such payment is considered final. If, during the term of the charter, a profit has thus become payable, a new and separate period of cumulation commences with the beginning of the calendar year following the period for which payment has been made and extends to the end of a following calendar year when cumulation for the entire intervening period (again

whether for a year or more) shows a profit to be payable. Thus as to any given charter, *depending on the operating figures,* there are three possibilities: (1) Additional charter hire may be payable following the end of each calendar year of the term of the charter or (2) no additional charter hire may ever accrue or (3) there may be one or more periods during the term of the charter when additional charter hire becomes payable.

The accounting periods for cumulation and computation of additional charter hire are determined by the operating figures. The end of each calendar year marks the date for casting up the figures to determine whether or not additional charter hire has become payable; but no payment becomes due unless the cumulation of figures for a year or longer shows the requisite excess of profits over losses.* When, however, such a payment is determined to be due, the effect of the proviso of the Section is to close that period of cumulation; a new period is then started for purposes of computation; and so on to the end of the charter period.

APL urges that Section 709(a) is to be read as requiring cumulation of profits and losses over the *entire* period of the charter. In the recent case of United States v. Moore McCormack Lines, Inc., 308 F.2d 866 (4th Cir., 1962; cert. den. 372 U.S. 944, 83 S.Ct. 937, 9 L.Ed.2d 969, 1963) reversing the District Court holding reported in 199 F.Supp. 522 (D. Md., 1961), the Court of Appeals gave such a meaning to the Section. It held that the profit payments made under the Maritime formula were to be considered merely tentative and were subject to readjustment at the end of the charter after a final audit of the operating figures for the entire term of the charter. The court there reasoned, and APL here contends, that the purpose of the proviso

was not to prevent profits from being carried forward against subsequent losses, but was only to protect the charterer against paying more than once on the same profits. It seems to this court, however, that the proviso proscribes the carry-forward for any purpose of profits once accounted for, i. e., whether to add to subsequent profits or to offset subsequent losses. Nowhere in the Section is there language which suggests that payments of additional charter hire are not final. Had Congress wished to indicate otherwise, it easily could have done so.

### 5. *The "quantum valebant" issue.*

■ The Government argues that if the charter is held illegal the parties would be relegated to a *quantum valebat* or *quantum valebant* situation and that under the doctrine of unjust enrichment APL would then be obligated to pay the fair market value of the vessels' use. See Massachusetts, supra, 202 F.Supp. at 308; Clark v. United States, 95 U.S. 539, 24 L.Ed. 518 (1877). But the holding here is not that the charter is illegal. The holding here is that only that portion of it which exceeded Maritime's authority is not to be enforced and that the parties, in effect, agreed that this would not invalidate the rest of the charter. To invoke *quantum valebat* here would be needlessly to cast adrift upon uncharted seas this charter, the parties to it and, prospectively, governmental agencies bound by Congressional limitation of rate-making power.

Counsel have indicated that the amounts to be awarded by judgment can be stipulated. They are granted thirty days in which to so do and in which to submit a proposed judgment accordingly implementing this opinion. Such judgment shall also effectively provide that payments of disputed charter hire made by American President Lines, Ltd., pur-

---

* Of course, it is possible, consistently with the foregoing, that the first or last payment of additional charter hire may be due for a period of less than a full year. For example, if the commencement date of the charter were June 1 and the op- erating figures for the ensuing six months to the end of that calendar year should show a profit payable on the basis set out in § 709(a), the amount of that profit would be payable as to that six months.

suant to the January 30, 1959 letter-agreement are without prejudice to the rights of either party and are not to be considered voluntary payments so as to bar recovery thereof.